Matthews *v.* Bailey, Governor.

4-5712                                     131 S. W. 2d 425

Opinion delivered August 16, 1939.

*Milton McLees, O. H. Nixon* and *E. Charles Eichenbaum*, for appellant.

*Jack Holt*, Attorney General, *Fred A. Donham, Beloit Taylor, Walter L. Pope* and *Rose, Loughborough, Dobyns & House*, for appellees.

*Coleman & Riddick, U. A. Gentry, Shields M. Goodwin, John P. Vesey, Herman E. McKaskle* and *Ben E. Carter*, amici curiae.

GRIFFIN SMITH, C. J.   Act 130, approved February 24, 1937, authorized the refunding of Arkansas state highway bonds aggregating $140,537,253.20.   There were amendatory and supplemental acts affecting the original purposes expressed in act 130, pertinent parts of which are referred to in *Roy Matthews* v. *Carl E. Bailey, Governor, et als., ante* p. 703, 130 S. W. 2d 1006.

In the opinion in the Matthews Case it was held that until the General Assembly should act, there was no power in the governor and the state board of finance (a) to issue non-callable bonds; (b) to give a pledge on highway revenues prior to highway and toll bridge maintenance; (c) to pay interest on $2,253,013.64 of "B" bonds which, under the provisions of act 11 of 1934, were interest free; (d) to pay overlapping interest during October, November, and December, 1939, on bonds not callable until January 1, 1940; and (e) to pledge revenues affecting turnback percentages.

Thereafter, acting under constitutional authority, the governor convened the General Assembly in extraordinary session, as a consequence of which act No. 4 was passed.   The measure was approved August 5, 1939.

Act No. 4 authorizes issuance of general refunding bonds ". . . in an amount not exceeding in the aggregate the principal amount of obligations [of the state of Arkansas] issued and authorized to be issued under authority of act 11 of the Second Extraordinary Session

of the Forty-ninth General Assembly, approved February 12, 1934." It was further provided that the new bonds should be sold at not less than par and accrued interest, and should bear interest ". . . averaging over the life of such issue less than the average rates of interest borne by the obligations to be redeemed out of the proceeds of such sale over the life of those issues; provided, however, that such general refunding bonds shall include a principal amount of bonds, bearing interest at a rate not to exceed two per cent. per annum, and maturing not later than three years from their date, equal to the amount of outstanding obligations, to be redeemed out of the proceeds of such sale, which now bear no interest."

An additional provision is that the refunding bonds ". . . may be issued and delivered not more than three months prior to the date upon which the obligations to be redeemed out of the proceeds of the sale of such general obligation bonds, or any of them, shall be redeemable. Such general refunding bonds shall mature, with or without option of prior redemption, in annual installments, beginning not later than the year 1942 and ending not later than the year 1977."

It will be observed that express authority is granted for refunding, at 2 per cent. interest, redeemable within three years, the so-called "B" bonds identified in the opinion of July 10th, amounting to $2,253,013.64; that power is conferred to pay overlapping interest for three months, estimated to be $475,346.69,[1] and that the bonds may be issued "with or without option of prior redemption"—in other words, callable, or non-callable.

---

[1] The term "estimated" is used because experience has shown that interest coupons on bonds are not always presented for payment. They become lost, or are destroyed, or through indifference the holders do not act. Under Item III of appellant's brief (the brief signed by Milton McLees, O. H. Nixon, and E. Charles Eichenbaum), beginning at page 55, it is urged that the executive order is void for the reason that direction is given for issuing bonds aggregating $568,-452.01 ". . . that have not been refunded under the provisions of act 11." Appellant seemingly overlooks the fact that act No. 4 authorizes not only the refunding of obligations funded by act 11, but it also authorizes the funding of obligations *authorized to be issued.*

Other provisions of the act will be commented on.

Machinery by which refunding operations may be carried out includes delegation to the governor of power to issue an executive order, to be filed with the secretary of state. In the order the governor must find that refunding would be to the best interest of the state. Certain definite pledges are authorized, language of the act being that the governor, with approval of the board of finance, ". . . is hereby authorized and empowered to make the following covenants and pledges in trust, which shall constitute an irrevocable contract between the state of Arkansas and the holders of such general refunding bonds."

First, the governor may pledge to set aside, in trust, for the payment of principal and interest of the bonds, the first $7,500,000 or lesser sum payable annually into the state highway fund on and after October 1, 1939, from the revenues arising from any motor vehicle license fees or taxes, and from a tax on gasoline or other motor vehicle fuel of 5¾ cents per gallon, ". . . sufficient to pay bond and interest requirements and to create such sinking fund reserve as may be agreed upon by the governor with approval of a majority of the members of the board of finance." The executive is further empowered to covenant, on behalf of the state, that while the bonds or interest are outstanding, neither motor vehicle license fees nor taxes shall ever be reduced below the rates prevailing as of the effective date of the act, ". . . nor shall the tax upon gasoline or other motor vehicle fuel, payable into the state highway fund, be reduced below 5¾ cents per gallon, except that whenever the revenues of the state highway fund shall exceed $15,000,000 per annum for three successive years, the General Assembly of the state of Arkansas may reduce the said motor vehicle license fees or taxes below the rate now prevailing, or may reduce the tax upon gasoline or other motor vehicle fuel, so long as such fees and taxes are estimated to certainly produce for the state highway fund not less than $15,000,000 per annum."

The power is delegated to covenant that if reductions should be made, in consequence of which revenues fell below $15,000,000, the General Assembly will restore the reduced tax or license fees, or both, so that the original revenues will be attained. The governor may also covenant that when the revenues exceed $15,000,000, fifty per cent. of the amount of such excess shall be paid as collected into a sinking fund. He may further covenant for the creation of a sinking fund into which shall be payable annually the difference between the amount of the principal and interest of the refunding bonds in any fiscal year, and the s u m of $7,500,000, together with the amounts payable into the sinking fund reserve.

Section 5 of the act provides for the disposition of revenues not pledged for debt service, and certain appropriations are made from such contingent revenues. Other provisions of the act are not material to this opinion. Mention is made of the preceding pledges because they form the basis of controversial points.

Appellant alleges issuance of an executive order and its approval by the board of finance, then charges: (a) That the governor, the board of finance, and the state refunding board are without power to consummate the refunding plan because act No. 4 was not passed in compliance with §§ 21 and 22 of art. 5 of the Constitution of Arkansas, and therefore the appropriations contained therein are void because the bill was not considered by the Committee of the Whole of the House of Representatives. (b) That at the time the executive order was signed, act No. 4 was not in effect because, notwithstanding the purported enactment of an emergency clause, such emergency clause failed on account of constitutional prohibitions. (c) That Paul Gutensohn, whom the governor had undertaken to appoint as a senator from the Fourth District, was one of 24 in the Senate who voted for adoption of the emergency clause; that the constitutional membership of the Senate was and is 35; that two-thirds of the full membership was necessary to enactment of the emergency clause, and that, eliminating Gutensohn's vote, only 23 senators voted for such emer-

gency. (d) That the act is a special act, and therefore prohibited by the Constitution. (e) That the order is void because it attempts to fund obligations authorized by act No. 11 of 1934, but which have never been funded. (f) That the act, in authorizing interest to be paid at 2 per cent. on certain bonds not presently drawing interest, violates Amendment No. 20 to the Constitution; and also that the same provision of the Constitution is violated through payment of interim interest on $47,534,-668.72 of bonds.

A sufficient answer to the allegation contained in subdivision "a" is that the Constitution does not require appropriation measures to be voted on by a committee of the whole. Each branch of the General Assembly may make its own rules and adopt its own procedure, subject only to the requirements expressed in the Constitution.

Subdivisions "b" and "c" will be discussed separately.

The act is not special, as alleged in subdivision "d." The state may legislate with respect to its own affairs. Amendment No. 14 to the Constitution has no application here.

The objection urged in subdivision "e" is disposed of in the first footnote to this opinion.

Questions raised in subdivision "f" were determined adversely to appellant's contentions in the Matthews-Bailey Case, *supra.*

In an *amicus curiae* brief filed by John P. Vesey, and in other briefs, it is insisted that act No. 4 is void because it delegates legislative powers to the governor. Specifically, complaint is made that the General Assembly did not authorize issuance of callable, or non-callable, bonds. The provision relating to callability has been quoted, *supra.* While constitutional questions may be raised for the first time on appeal, it is our view that this phase of the controversy should be more exhaustively briefed, and we therefore decline to pass upon the issue at this time.

The remaining matters of controversy are: (1) Does act No. 4 create vested rights, and (2) was the Senate's vote on the emergency clause sufficient to enact it?

A provision of Amendment No. 7 to the Constitution is that ". . . an emergency shall not be declared on any franchise or special privilege or act creating any vested right, or interest, or alienating any property of the state."

It is urged by appellees that four things are set up in the constitutional amendment, affecting which an emergency clause would be invalid: A franchise, a special privilege, an act creating a vested right or interest, an act alienating any property of the state. Admittedly, act No. 4 does not create a franchise, a special privilege, or alienate any property of the state. If the measure falls within any of the classifications as to which an emergency cannot be declared, it must be the third division—an act creating a vested right or interest. Appellant says that if one has a vested right or interest, he has a fixed, settled, or absolute right; that "vested" is primarily interpreted as meaning "free from all contingencies." In *Steers* v. *Kinsey*, 68 Ark. 360, 58 S. W. 1050, it was said: "A vested right must be something more than a mere expectation based upon the anticipated continuance of existing laws. It must have become a title to the present or future enjoyment of the property in some way or another. Parties have no vested rights in remedies or matters of procedure." It is also well settled that no one has a vested right in a public law. *Robinson* v. *Robinson*, 193 Ark. 669, 101 S. W. 2d 961.

After citing the foregoing language, appellees say:

"In other words, before an act would come under the classification of granting a vested right or interest, it must be one that grants or transfers to an individual, person, or corporation, some right or interest which he or it is immediately entitled to use. . . It is true that various steps can be taken by the governor and by the board of finance which will ultimately result in the sale

of the bonds, which bonds will be secured by a pledge of revenues. The holders of these bonds will have vested rights, as was said in the case of *Hubble* v. *Leonard,* 6 F. Supp. 145, cited in appellant's brief, but they do not receive those vested rights upon the passage and approval of this act, because the act does not grant any vested rights. Any right that anyone may obtain under this act will be contingent upon action being taken by the governor and board of finance. A vested right is one that does not depend upon any contingencies; therefore, the act itself creates no vested rights or interests.''

In another paragraph appellees say: ''If the act created a vested right, then, unquestionably, the Legislature would have no authority to enact it as an emergency measure.''

Appellees also insist that act No. 4 is not subject to referendum because Constitutional Amendment No. 7, which authorizes such procedure in proper cases, was repealed by Amendment No. 20 to the Constitution. Amendment No. 20 is:

''Except for the purpose of refunding the existing outstanding indebtedness of the state and for assuming and refunding valid outstanding road improvement district bonds, the state of Arkansas shall issue no bonds or other evidence of indebtedness pledging the faith and credit of the state or any of its revenues for any purpose whatsoever, except by and with the consent of the majority of the qualified electors of the state voting on the question at a general election or at a special election called for that purpose.''

Appellees' comment is: ''While Amendment No. 20 does not positively or affirmatively say that refunding bonds are not to be approved by a vote of the people, it absolutely negatives any requirement that they must receive such approval. The right to vote on a question can be taken away either by a positive statement to that effect or by a negation of the right. Before Amendment No. 20 was adopted, the people were given the right by Amendment No. 7, under certain conditions (filing nec-

essary petitions by a certain time) to vote on an act of the Legislature authorizing issuance of refunding bonds, but Amendment No. 20 takes this right away—not by a positive, but by a negative statement."

Our view is that the two amendments do not conflict in the slightest degree—suggestively, remotely, inferentially, or by any other method of construction. We do not think that when Amendment No. 20 was written, Amendment No. 7 was even thought of by authors of the new proposal; and certainly the people in adopting the last amendment did not visualize or meditate the refinement of language here urged. There is no implication that repeal was intended, or that there was a purpose to supersede the referendum.

At the time Amendment No. 20 was proposed, and when it was adopted, enormous public obligations were outstanding. It was recognized that (short of a miracle which was not expected and has not materialized) the state could not pay its highway obligations and provide for payment of road improvement district bonds according to the tenor of the numerous promises. Hence, funding and refunding were essential. Because the state's direct obligations were largely involved, and because property of citizens in half of the counties of Arkansas was pledged, it was felt that these liabilities should be recognized without the formality of referendum or referenda; but as to future pledges, the plan was to circumvent them unless there should be public approval. Hence, Amendment No. 20.

In preceding paragraphs we have copied from appellees' brief their argument in refutation of the contention that act No. 4 creates a vested interest. Appellees, however, concede correctness of appellant's position, but seek to avoid the consequences through interjection of Amendment No. 20. Before this amendment was adopted, appellees say, the people had a right to vote on legislative measures authorizing issuance of refunding bonds. Appellees further say that such right arose because of Amendment No. 7, and that the right was per-

fected when petition was filed "by a certain time." The right to refer and thereby to suspend operation of a legislative act extends only to measures to which the emergency clause is not attached. Measures carrying the emergency clause may be referred, but the law is in force until an adverse vote has been registered by the people in the manner provided by the amendment. But, as appellees have pointed out, under Amendment No. 7 the people were given the right to vote on an act authorizing the issuance of refunding bonds, and that right exists because an act creating vested interests is not subject to the emergency clause, and because refunding bonds which pledge revenues in trust, executed under the plan of act No. 4, are sustained by vested interests. If the bonds were not so secured there would be no purchasers, and an attempt to refund would be futile.

In seeming disregard of the foregoing declaration —a declaration which necessarily carries an admission that Amendment No. 7 provides for a vote by the people "on an act of the Legislature authorizing issuance of refunding bonds"—appellees urge that act No. 4 does not create vested interests because there must be an acceptance of the governor's offer to sell bonds before an investiture is completed; and before such acceptance is possible the period of 90 days within which petitions may be filed shall have expired. Therefore, by lapse of time which cannot be prevented, the right of the people to move in their own interest becomes barred, and the vested interest of bond purchasers arises through a process of construction wholly lacking in logic, and entirely devoid of that degree of common sense which mature minds ordinarily apply in dealing with serious matters.

To say that an act of the Legislature does not create a vested interest, but that such status occurs only when under terms of the act which delegates to an official plenary power to contract on behalf of the state, to pledge its full faith and credit and all of its resources, and particularly to set aside annually in trust millions of dollars arising from excise and other taxes—to say

that the act itself does not create a vested interest within the meaning of Amendment No. 7, but that acceptance of the official's offer is necessary before the relationship in question arises, is to argue that the greater does not include the lesser. It is to insist that intent may be warped at the call of interest, and it is to admit that words and phrases may be mutilated and deprived of their symmetry at the instance of convenience, and distorted if need be to create a breach in reason.

The next question is, Was Paul Gutensohn a member of the Senate, either *de jure* or *de facto?*

Fred Armstrong was elected senator in 1938 to represent the Fourth Senatorial District. He died December 10th of the same year. Paul Gutensohn was appointed by the governor to succeed Armstrong, and took the oath of office. The record does not disclose a finding by the Senate that he was a member of that body, although he served actively. He was not paid as members are ordinarily paid, but received compensation as the result of an act passed by more than two-thirds of both branches of the General Assembly, and signed by the governor. Act 81 of 1939.

Amendment No. 7 to the Constitution contains the following provision: "If it shall be necessary for the preservation of the public peace, health and safety that a measure shall become effective without delay, such necessity shall be stated in one section, and if upon a yea and nay vote two-thirds of all the members elected to each house . . . shall vote upon a separate roll call in favor of the measure going into immediate operation, such emergency measure shall become effective without delay. It shall be necessary, however, to state the fact which constitutes such emergency."

After the bill which became act No. 4 had finally passed the Senate, a separate vote was had upon the emergency clause. Twenty-three senators and Mr. Gutensohn voted in favor of the emergency, and it was declared carried.

It is now insisted that 35 members were elected to the Senate; that two-thirds of that number is 24; that Gutensohn's vote was not the vote of a senator and should not be counted, and that without such vote the emergency failed.

It will be conceded that the governor has not the power to appoint members of the Legislature, and has never had. But the practice of making such appointments has persisted. As an express condemnation of the policy of appointing, Amendment No. 29 to the Constitution was adopted November 8, 1938, and became effective thirty days thereafter. By § 1 it provides: "Vacancies in the office of United States senator and in all elective state, district, circuit, county and township offices, except those of lieutenant governor, members of the General Assembly and representatives in the Congress of the United States, shall be filled by appointment by the governor." The attempt to appoint Gutensohn was made January 4, 1939.

Appellees contend that even though the power of appointment was wholly lacking, the appointment was in fact made, and that Gutensohn entered upon his duties, and thereby became a member of the Senate, de facto. If indeed his status was that of de facto officer, third parties affected by his activities are not to be penalized. By quo warranto proceedings his right to act should have been questioned. It has been held that the chancery court lacks jurisdiction to pass upon the qualification of a member of the General Assembly. Davis v. Wilson, 183 Ark. 271, 35 S. W. 2d 1020. There are other similar decisions, and the rule seems to be that if an official acts under color of office, even though he is not in fact an officer, proceedings in which he participates are not rendered invalid, even though the majority by which determination of a question was arrived at may have depended upon his vote. He may not, however, profit personally by his own misconduct.

Appellees direct attention to § 11 of art. V of the Constitution, which provides that "Each house shall ap-

point its own officers and shall be sole judge of the qualifications, returns and election of its own members."
It is urged that inasmuch as Gutensohn was apparently accepted by the Senate, the effect was a determination by that body that he had a right to membership; therefore, in spite of the Constitution and the known fact of his status, the question of eligibility, it is argued, cannot be raised collaterally.

No court should be so technically hide-bound. The Constitution was made to be interpreted and enforced. When the judiciary was created there was no intent that it should side-step responsibility and hide behind precedent in an effort to promote a harmonious confluence of incompatible elements.

We find no case of our own holding that legislation enacted by the vote of a stranger to the Senate or the House is sacrosanct. There are no instances where it has been said that designation by appointment contrary to the Constitution shall have the force of election, or that the admitted right of the Senate and the House to judge of the qualifications, returns and election of members goes to the extent of nullifying the Constitution. Those elected to the General Assembly take an oath to support the Constitution, and there is no presumption that senators and representatives do not intend to adhere to the basic law, and they do attempt to obey it.

At page 589, § 307, of 22 Ruling Case Law, it is said:

"The *de facto* doctrine was introduced into the law as a matter of policy and necessity, to protect the interests of the public and individuals, where those interests were involved in the official acts of persons exercising the duties of an office, without being lawful officers. It was seen that it would be unreasonable on all occasions to require the public to inquire into the title of an officer, or compel him to show title, especially since the public has neither the time nor the opportunity to investigate the title of the encumbent."

At page 596, § 318, the same authority says:

"One of the important classes of *de facto* officers consists of those who enter into the possession of an office and exercise its functions by reason of an appointment which is informal or defective. As already seen, the defective appointment constitutes color of title or color of appointment. Therefore, the general rule is that when an official, person or body, has apparent authority to appoint to public office, and apparently exercises such authority, and the person so appointed enters on such office, and performs its duties, he will be an officer *de facto*, notwithstanding there was want of power to appoint in the body or person who professed to do so, or although the power was exercised in an irregular manner."

In the instant case there was no *apparent* authority to appoint Gutensohn; and, although the latter served energetically and with a high degree of intelligence, the service was not that of a senator; nor could he have been a *de facto* officer in view of the want of apparent authority by the appointive agency.

In *Oliver* v. *Southern Trust Company*, 138 Ark. 381, 212 S. W. 77, it was held that a valid appropriation of money to pay the cost of an exhibit for Arkansas at the Panama-Pacific Exposition in 1915 required a vote of two-thirds of the members *elected* to each branch of the General Assembly. This case is authority for the holding that where, by the plain language of Amendment No. 7 two-thirds of the members elected to each branch of the General Assembly are necessary to enactment of the emergency clause, two-thirds of 35 elected members must vote in the Senate, else such emergency has failed. When Gutensohn's vote (which was not in fact a vote) is subtracted from the total of 24, it follows that the remaining 23 votes fell short of the required two-thirds. Cases from other jurisdictions sustain this holding, although there is some authority to the contrary.

The chancellor's decree in sustaining appellee's demurrer to the complaint is reversed, and the cause is

remanded with directions to proceed in a manner not inconsistent with this opinion.

SMITH, MCHANEY, JJ., and HOLLAND, Special J., dissent.

SMITH, J. (dissenting). In the former opinion, to which the majority refer, it appears that the attempt to refund the state's highway indebtedness had been made pursuant to acts 130, 151 and 278 of the Acts of 1937 and act 257 of the Acts of 1939, and it was held by the majority that these acts did not confer the authority which the governor had attempted to exercise; but of these acts the majority said: "We holds that acts 130, 151, 298 and 257, mentioned in the pleadings, were lawfully passed, and that no constitutional impediments void the measures."

The effect of that opinion is that there was no constitutional objections to the refunding plan, but that legislative authority for it was lacking. It became necessary, therefore, to repair to the General Assembly to acquire the authority which the majority said the acts referred to did not confer. A special session of the General Assembly was convened to confer this authority, and act No. 4 was passed at the special session of the General Assembly to confer that authority. The governor is now attempting to refund the state's highway indebtedness pursuant to the authority conferred by act No. 4 of the special session, but the majority opinion aborts this second attempt.

The majority reserve the question whether act. No. 4 is inoperative, in that it confers legislative authority upon the governor, by permitting him to determine whether the new bonds shall be callable on demand or payable only on fixed maturity dates, and permits him to determine the rate of interest which the bonds shall bear. The former executive order for refunding was attacked with even more enthusiasm and eclat than is the present plan, and the objection just stated, which the majority reserve, was raised to the former order in a number of the briefs filed in that case.

The opinion in the former case enumerated these objections, concluding with the statement that "The governor may, at his option, authorize issuance of bonds containing a clause reserving to the state the right to call for redemption prior to maturity, on thirty days' notice.

"Assuming that act 130 conferred upon him all of the powers necessary to do those things set out in the executive order, one provision of the order is:

"'Said bonds shall be dated October 1, 1939, and shall bear such rates of interest and shall mature at such time or times not exceeding forty years, as shall be hereafter fixed by executive order approved by the Board of Finance; provided, however, that the interest rates borne by the refunding bonds shall be so fixed that for the aggregate amount of outstanding obligations bearing any one rate of interest there shall be at least an equal amount of refunding bonds bearing a lower rate of interest, except that there may be an amount of refunding bonds equal to the amount of outstanding obligations, which bear interest at the rate of $3\frac{1}{2}$ percentum per annum, which may bear interest at a rate not exceeding such rate, and an amount of refunding bonds equal to the amount of outstanding obligations, which bear interest at the rate of 3 percentum per annum, or no rate of interest, which may bear interest at a rate not exceeding 3 percentum per annum.'

"If authority for the procedure affirmed in the order has been expressly conferred by act 130; or if, by fair construction, it can be said that the things the governor contemplates doing were intended by the legislature, and if that intent can be gathered from the language used, then the lower court's action in denying injunctive relief should be sustained."

Having thus held in the former opinion that there was no delegation of legislative authority, we do not understand the necessity of reserving that question in the instant case.

Act No. 4 confers the power which act No. 130 was said not to contain, and if the former rule is adhered

to, "then the lower court's action in denying injunctive relief should be sustained."

Act No. 4 no more delegates legislative power than did act 130. The duties imposed upon the governor under both acts, and specifically under act No. 4, are to perform the functions under which the law becomes operative. The bonds are authorized by the act, and are to be issued pursuant to it. The bonds are not issued by the legislature, and could not be. It was essential that the legislature designate an agent to execute its will, and authorizing its agent to negotiate for the best terms obtainable was not a delegation of legislative authority.

The objection that the state had delegated legislative authority was made to the creation of the Revolving Loan Funds by act No. 119 of the Acts of 1927, under which the State Board of Education was authorized to borrow and lend money. In overruling that contention in the case of *Ruff* v. *Womack,* 174 Ark. 971, 298 S. W. 222, it was said: "7. Constitutional Law—Delegation of Legislative Power.—The Revolving Loan Fund Law providing for the sale of state bonds by the State Debt Board, for the purpose of borrowing money from permanent school fund, and for lending the money obtained to needy school districts by the State Board of Education, is not invalid as delegating legislative power to either of these boards, as the power conferred is merely that of enforcing the law after making investigations."

The emergency clause is held inoperative for two reasons, the first being that the act grants vested rights and is, therefore, not subject to have an emergency clause attached.

In our opinion, this holding is, not only unsound, but is very unfortunate, and, if followed, will lead to great confusion in future legislation.

The majority have misconceived the meaning of a vested right. The definition in Webster's New International Dictionary is: "Law. That has become a complete and consummated right; that has taken effect as an

immediate fixed right to present or future enjoyment, as *vested* interests, *vested* rights, a *vested* legacy, etc.''

To whom has act No. 4 granted a vested right? Who has now a present right arising under this act? No one has, and no one may ever have. It is possible bonds may never be issued under act No. 4. If not, who has been deprived of some right conferred upon him by the act? Now, of course, vested rights may be acquired under this act, just as they may be acquired under nearly every act of the General Assembly. But they have not yet been, and until rights have been acquired they cannot be vested. The prior acts herein referred to authorized the refunding of the state's highway debt, and had the state's highway debt been refunded under those acts, vested rights would have been acquired; but it was not refunded under those acts. Can it be said that vested rights have been granted under these prior acts? Act No. 4 no more grants vested rights than did the former legislation on the same subject.

In the case of *Little Rock Railway & Electric Co.* v. *Dowell,* 101 Ark. 223, 142 S. W. 165, Ann Cas. 1913D, 1086, Chief Justice McCULLOCH said: ''It is said by a learned author on constitutional law that 'the term ''vested right'' relates to property rights only, and does not apply to personal rights.' Black on Constitutional Law, p. 429.'' Judge McCULLOCH then further said: ''Judge RIDDICK, speaking for this court and quoting in part from Mr. Black, said: 'Now, a vested right must be something more than a mere expectation based upon the anticipated continuance of existing laws. It must have become a title, legal or equitable, to the present or future enjoyment of property in some way or another.' *Steers* v. *Kinsey,* 68 Ark. 360, 58 S. W. 1050.''

We ask again, who has acquired title, legal or equitable, to anything under act No. 4?

In the case of *Pearsall* v. *Great Northern Railway Co.,* 161 U. S. 646, 16 S. Ct. 705, 40 L. Ed. 838, it was said: ''A vested right is defined by Fearne, in his work upon Contingent Remainders, as 'an immediate fixed right of present or future enjoyment;' and by Chancellor

.Kent as 'an immediate right of present enjoyment, or a present fixed right of future enjoyment.' 4 Kent Com. 202. It is said by Mr. Justice Cooley that 'rights are vested, in contradistinction to being expectant or contingent. They are vested when the right to enjoyment, present or prospective, has become the property of some particular person or persons as a present interest. They are expectant, when they depend upon the continued existence of the present condition of things until the happening of some future event. They are contingent, when they are only to come into existence on an event or condition which may not happen or be performed until some other event may prevent their vesting.' Principles of Const. Law, 332.''

If the majority opinion should hereafter be followed, the value of the emergency clause has been destroyed, for the reason that under nearly every act of the Legislature vested rights may accrue, and many acts of every session of the General Assembly authorized things to be done, which, if done, will create vested rights; but this is quite a different thing from the act itself creating the right. We submit that act No. 4 does not create a vested right. It authorizes action which, if taken, will create a vested right; but that is true of most legislation.

The majority have much to say about the emergency clause attached to act No. 4. It is the opinion of the judges, who join in this dissent, that this discussion is beside the question, as, in our opinion, this act is not subject to the referendum, even though it had no emergency clause.

It is true that under the original I. & R. Amendment the practice of adding the emergency clause became so common as to be an abuse, which the second and our present I. & R. Amendment (No. 7) attempted to cure. This was by requiring the General Assembly to state the facts which constituted the emergency, and by requiring a separate vote upon the emergency clause. To adopt this clause, an affirmative vote of two-thirds of all the members elected to each House was essential, but the amendment authorized the people to order a referendum

notwithstanding the adoption of the emergency clause. However, it was required that the petition be signed for the referendum by not less than six per cent. of the legal voters, and so the law remains except in the matter of legislation authorizing the state to issue bonds. Amendment No. 20 effects a complete change in the referendum in this respect. This Amendment No. 20 was adopted in 1934, the very year in which the original refunding act was passed—act No. 11 of the 1934 Special Session. It was as well known, when Amendment No. 20 was adopted, as it is now, that our own highway debt could not be paid under act No. 11, and that future refunding legislation would be required. In the adoption of Amendment No. 20 the issuance of state bonds was prohibited "except by and with the consent of the majority of the qualified electors of the state voting on the question at a general election or at a special election called for that purpose." It was made unnecessary for the people to invoke the referendum by filing petitions and otherwise complying with the I. & R. Amendment No. 7. The referendum was automatic, and was a prerequisite to a bond issue by the state except for the purpose of refunding the existing indebtedness of the state. This did not involve the creation of a new or additional debt. The state's obligations in regard to the highway debt had been recently fixed by act No. 11 of the 1934 Special Session, and that this debt would at some time have to be refunded was a matter of common knowledge.

In the case of *Talkington* v. *Turnbow,* 190 Ark. 1138, 83 S. W. 2d 71, the facts were that Pope county had issued bonds under the authority of Amendment No. 10, which the county was unable to pay as they matured. It became necessary to refund those bonds by extending maturity dates, and that action was taken under the authority of the order authorizing the original issuance of the bonds. Headnotes 1 and 2 in that case read as follows:

"1. Counties—Refunding Bonds.—The general rule is that the power conferred on counties to issue bonds in the first instance includes the power to refund them, pro-

vided that the refunding bonds do not increase the amount of the outstanding bonds or the rate of interest.

"2. Counties—Refunding Bonds—Notice.—Notice of an order of the county court refunding the county's bonds is not required by act 102 of 1935."

In the body of the opinion in that case it was said: "The power and authority conferred by said constitutional amendment on counties to issue interest-bearing bonds to pay their existing indebtedness necessarily implied that they might refund said bonds if it became necessary, provided they should not increase the amount of the outstanding bonds or the rate of interest. By doing this, no additional burden would or could be imposed upon the taxable property of the county. The general rule is that power conferred to issue bonds in the first instance includes the power, by necessary implication, to refund said bonds."

In the later case of *Arkansas Mortgage & Securities Co.* v. *Street Improvement District No. 419,* 191 Ark. 487, 86 S. W. 2d 917, we said that "refunding bonds are only a new acknowledgment of an old debt."

Amendment No. 20 fully covers the subject of the issuance of bonds by the state and suspends the provisions of Amendment No. 7 in that respect. It renders unnecessary any action on the part of the electors to have submitted to them the question whether the state shall issue additional bonds for any purpose except bonds to refund existing outstanding indebtedness of the state, which, as was said in the Arkansas Mortgage & Securities Company Case, *supra,* would only be a new acknowledgment of an old debt.

It is, therefore, in our opinion, unimportant whether act No. 4 has an emergency clause or not, and the fact that the General Assembly took the precaution to attach the emergency clause does not alter the law of the case.

However, we are of the opinion that the act contains a valid emergency clause. The facts recited in this clause as constituting an emergency are known to the entire citizenship of the state.

We are asked in the briefs of counsel for appellant to overrule the case of *Jumper* v. *McCollum,* 179 Ark. 837, 840, 18 S. W. 2d 359, but this the majority declined to do, and it has not been done. The rule there announced as to the sufficiency of the emergency clause must, therefore, be followed. It was there said: "Of course, an emergency clause which did not state the fact constituting the emergency would not suffice; nor would a recited fact which was so obviously and demonstrably inefficacious to constitute an emergency that all fair-minded and reasonably intelligent men would say to the contrary. But the converse of this proposition is equally true. If the fact which constitutes the emergency is recited, and if fair-minded and intelligent men might reasonably differ as to the sufficiency and truth of the fact assigned for placing the act in effect immediately upon its passage, the courts are concluded by the finding. See the many cases under the subhead, 'Encroachment on Legislature,' § 15 of the chapter on Constitutional Law, volumes 1 and 5, Crawford's Digest of the Decisions of the Supreme Court, and the same section and subhead of Crawford's Supplement."

In addition to the holding that the emergency clause was invalid, in that act No. 4 conferred vested rights, that clause is held invalid for the reason that its adoption was effected by the vote of Senator Gutensohn, who was not, in fact, a senator. The majority hold that Senator Gutensohn, appointed by the Governor to succeed Senator Armstrong, who was elected to the office, but who never qualified as such, because he died prior to the convening of the regular session in January, 1939, was not a senator, either *de facto* or *de jure,* and that his vote in favor of the adoption of the emergency clause cannot be counted, leaving only 23 votes in favor of adoption, whereas 24 votes are required.

We cannot agree. In our judgment this holding overrules all our previous decisions to the effect that each house of the General Assembly is "the sole judge of the qualifications, returns, and elections of its own members," including that of eligibility, from which there is no appeal, and that the courts are without power to un-

seat a member seated by either house or to hold invalid any law enacted by the necessary vote of such member. The opinion of the majority in this respect is, not only unprecedented in the decisions of this court, but is in direct conflict therewith as well as the decisions of courts of other states and the Supreme Court of the United States.

It is undisputed that Senator Gutensohn was appointed by the Governor; that he was seated as a Senator by the Senate; and that he participated in all the proceedings coming before the Senate as a member thereof. Let it be conceded that the Governor did not have the power to appoint Gutensohn, and that his act in doing so was in violation of § 6 of art. 5 of the Constitution, and § 1 of Amendment No. 29 thereof, and that by reason thereof he did not have the right to serve. Another provision of the Constitution is § 9 of art. 5, which provides that no person convicted of certain crimes shall be eligible to serve in the Legislature. These provisions are limitations on the Governor and the Legislature, but if they disregard these wholesome provisions, the courts are powerless to interfere. This is true, because another provision of the Constitution, § 1 of art. 5, provides: "Each house shall appoint its own officers, and shall be sole judge of the qualifications, returns, and elections of its own members. . . ." Substantially the same provision is in all the state constitutions, and the Constitution of the United States, in part, is as follows: "Each House shall be the judge of the election, returns, and qualifications of its own members. . . ." In ours it says "Each house shall be sole judge," whereas in the federal Constitution it leaves out the word "sole" and says: "Each house shall be judge," etc.

The reason for this wise provision of the Constitution was and is to make the legislative department independent of the judicial, and to make each house an independent court in respect to the election, qualification and eligibility of its own members. There is no provision to be found anywhere in the Constitution that authorizes the courts to upset a decision of either House in this re-

gard. Perhaps, one of the best statements of the reason and necessity for such a constitutional provision is that of Judge Brewer, of the Supreme Court of Kansas, later a Justice of the Supreme Court of the United States, in *State, ex rel. Martin,* v. *Gilmore,* 20 Kan. 551, where he said: "The constitution declares, article 2, section 8, that 'Each House shall be judge of the elections, returns, and qualifications of its own members.' This is a grant of power, and constitutes each House the ultimate tribunal as to the qualifications of its own members. The two houses acting conjointly do not decide. Each House acts for itself and by itself; and from its decision there is no appeal, not even to the two Houses. And this power is not exhausted when once it has been exercised, and a member admitted to his seat. It is a continuous power, and runs through the entire term. At any time, and at all times during the term of office, each House is empowered to pass upon the present qualifications of its own members. By Section 5 of the same article, acceptance of a federal office vacates a member's seat. He ceases to be qualified and of this the House is the judge. If it ousts a member on the claim that he has accepted a federal office, no court or other tribunal can reinstate him. If it refuses to oust a member, his seat is beyond judicial challenge. This grant of power is in its very nature (and so as to any other disqualification) exclusive; and it is necessary to preserve the entire independence of the two houses."

Another splendid statement is the following from Judge Cooley's opinion in the case of *People ex rel. Drake,* v. *Mahoney,* 13 Mich. 481: "While the constitution has conferred the general judicial power of the State upon the courts and officers specified, there are certain powers of a judicial nature which, by the same instrument, are expressly conferred upon other bodies or officers; and among them is the power to judge the qualifications, elections and returns of members of the Legislature. The terms employed clearly show that each House, in deciding, acts in a judicial capacity, and there is no clause in the constitution which empowers this, or any other court, to review their action. . . .

854

"It may happen, as suggested, in the argument, that with each House, not only deciding for itself questions of fact, but also construing for itself the law, we may sometimes witness the extraordinary spectacle of two bodies construing and enforcing the law differently, while a third construction is enforced by the courts upon the public at large. But with this possibility in view, the evils of allowing the courts a supervisory power over the decisions of the Houses upon the admission of members, are so great and so obvious that it is not surprising that the framers of the constitution refrained from conferring the power."

In our own recent case of *State, ex rel. Evans,* v. *Wheatley,* 197 Ark. 997, 125 S. W. 2d 101, a case written by one of the majority, in which Wheatley had, some years prior to his election, been convicted of a felony, and appellant was seeking to prevent him from serving under § 9, of art. 5, of the Constitution, the question for decision was stated as follows: "The appellant insists here that the trial court had jurisdiction to hear and determine this cause; that the action of the Senate in seating Wheatley as a member of that body did not deprive the courts of jurisdiction to pass on his eligibility to serve as a senator, and that the constitutional provision, that each House of the General Assembly shall be the sole judge of the elections, and qualifications of its members, did not include the power to judge as to the eligibility or ineligibility of anyone who might be elected to such a body." After quoting art. 5, § 11, of the Constitution, and after citing cases as to the proper construction of the language quoted, it was said: ". . . It is undisputed here that the Senate had passed upon the qualifications of Senator Wheatley and held him qualified. Article V, § 9, of the Constitution provides: 'No person hereafter convicted of embezzlement of public money, bribery, forgery or other infamous crime shall be eligible to the General Assembly or capable of holding any office of trust or profit in this State.' Appellant insists that Senator Wheatley is ineligible to a seat in the Senate under this provision of the Constitution for the reason that he has been convicted of an infamous crime.

We hold that the Senate is the sole judge of his eligibility under this section. It may be that the Senate in passing upon his eligibility or qualifications found that the crime with which he was charged was not infamous. But be that as it may, the action of the Senate in that regard and in seating him is final, and the trial court in this case was without jurisdiction to determine that matter. We cannot agree with appellant that the word 'qualifications' as used in § 11, art. V, of the Constitution, should be given the restricted definition and interpretation which he insists should be placed upon it. We think it includes and embraces the word 'eligibility.' ''

This was the unanimous decision of the court, but the majority have departed from it and, in effect, have overruled it.

In *Young* v. *Boles,* 92 Ark. 242, 122 S. W. 496, we held (to quote a syllabus), ''Where in an election contest for the office of State Senator, the circuit court directed a recount of the ballots, and pending an appeal from such order to the Supreme Court, the contestee was declared by the State Senate to be entitled to retain his seat, . . . the appeal, on motion of the appellee, should be dismissed.''

See, also, *Parish* v. *Nelson,* 186 Ark. 786, 55 S. W. 2d 922; *Barry* v. *United States,* 279 U. S. 597, 49 S. Ct. 452, 73 L. Ed. 867; *Reif* v. *Barrett,* 355 Ill. 104, 188 N. E. 889; *State, ex rel. Boulware,* v. *Porter,* 55 Mont. 471, 178 Pac. 832; *Sherrill* v. *O'Brien,* 188 N. Y. 185, 81 N. E. 124; and note to 107 A. L. R. 205.

In the Montana case, *supra,* the court said: ''The authority thus recognized as lodged in each House is indispensable to its independence and existence. It emanates directly from the people to each House as an independent entity, and cannot be delegated or granted away. Each House acts for itself, and from its decision there is no appeal. No individual, officer, court, or other tribunal can infringe upon its exclusive prerogative to determine for itself and in its own way, whether a person who presents himself for membership is entitled to a seat. . . . . Either House may even act arbitrarily and in disregard

of fundamental rights. It may oust a member whose election is beyond controversy, and seat as a member a person who is disqualified for the office, but, if it should do so, there is still no recourse.''

From these and many other cases that might be cited, it is perfectly clear that the qualification and eligibility of Senator Gutensohn were questions for the ''sole'' consideration of the Senate, and that its action in seating him is conclusive, and cannot be reviewed by this court.

In any event, Senator Gutensohn was a *de facto* officer, whose right to serve and vote cannot be attacked collaterally. *Forrest City Gro. Co.* v. *Catlin,* 193 Ark. 148, 97 S. W. 2d 910; *Hodges* v. *Keel,* 108 Ark. 184, 159 S. W. 21; *Davis* v. *Wilson,* 183 Ark. 271, 35 S. W. 2d 1020.

In *Stevens* v. *Shull,* 179 Ark. 766, 19 S. W. 2d 1018, 64 A. L. R. 1258, it was held that an ordinance creating an improvement district cannot be collaterally attacked as being improperly passed, because one of the aldermen whose vote was necessary to its passage, did not reside in the city, since he was at least a *de facto* officer, and his qualifications to serve could not be inquired into in that suit. Citing *McClendon* v. *State,* 129 Ark. 286, 195 S. W. 686, L. R. A. 1917F, 535.

If the decision of the majority is to stand, upsetting and holding void the action of the Senate in seating Senator Gutensohn, and in holding his vote on the emergency clause void and of no effect, an intolerable condition will arise with reference to every act passed by the 1939 session of the General Assembly. No one can certainly know, no lawyer, no judge, whether any act of that session has been lawfully enacted, without a search through the Senate Journal to determine how Gutensohn voted, and whether his vote was necessary to the passage or defeat of any measure. The published acts of the Legislature will no longer import verity. They stand stamped by the decision of the majority with uncertainty and doubt. No longer can the Acts of 1939 be cited without a showing from the Journal of the Senate that the vote of Gutensohn was not necessary for the passage of the act cited. And this most intolerable condition is a red

flag of warning of danger in repealing or making nugatory the constitutional mandate that "Each House shall . . . be sole judge of the qualifications, returns and elections of its own members." The framers of this provision knew what they were about. They knew that, if each House were not made the judge of the qualifications of its own members, and such matter be left to the courts, no one could tell whether a published law be valid or not, without an exhaustive search of the records to determine who were lawful members and who were not, and how they voted.

No importance is to be attached to the fact that the Legislature passed act 81, appropriating $1,000 "for the purpose of paying Paul Gutensohn for services rendered to the State of Arkansas," without reciting that it was for services rendered as a State Senator. The whole context of the act shows it was for such purpose, and § 3 recites "that without such services, the county of Sebastian would be deprived of representation in the Senate of the General Assembly," etc. The only service rendered was as a State Senator.

In our opinion, act No. 4 confers no vested right.

We are of the opinion, also, that, if the act is, in fact, subject to the referendum without an emergency clause, it has a valid clause of that character, which makes it immediately effective, and we, therefore, dissent from the holding of the majority, which overrules the opinion of the court below denying injunctive relief.

I am authorized to state that Justice McHaney and Special Justice Holland concur in the views here expressed.