HOWELL *v.* HOWELL and STEVENS *v.* STEVENS.[*]

4-8389—4-8371                                     208 S. W. 2d 22

Opinion delivered January 12, 1948.
Rehearing denied February 9, 1948.

[*] See *Pope* v. *Pope, infra,* p. 321.

*John L. Sullivan,* for appellants.

*Ruth May Wassell* and *Chas. Jacobson,* for appellees.

GRIFFIN SMITH, Chief Justice. On the appellant's allegation that the decree from which he appeals is void, we treat the cause as having been brought up by *certiorari.*

Ruth Howell, plaintiff below, procured from the Second Division of Pulaski Chancery Court a decree of divorce from George Howell, the latter having declined to defend until enforcement of the decree was undertaken. He then asserted invalidity of Act No. 42 of 1947 under which the General Assembly attempted to relieve from obvious overwork the regular Chancellor—a Chancellor whose excellent record in many complicated cases has often been reviewed by this Court.

Appellee's first contention is that the Court's status, not having been raised at trial, cannot be considered here. It is argued that *quo warranto* is the exclusive method for questioning acts of an official; and, it is urged, the present proceeding, being a collateral attack upon an order regular on its face, the decree must be treated with that respect due judgments of all courts of record, hence the only matters subject to review are errors assigned as grounds for reversal.

The right of a supervising court to deal with a particular proceeding in a manner consistent with justice and to thereby expeditiously dispose of issues is unquestioned where recourse to the procedure is not prejudicial to one who is not immediately before the appellate court and where there is no statutory or constitutional impediment. If the result arrived at is the only one that in any event could be reached, the party indirectly affected is not injured. To this end appeal may be treated as *certiorari.* The writ may not be used as a substitute for appeal. It is insufficient because only the face of the record and matters of which the appellate court takes judicial notice may be considered. But it does not follow that an appeal

cannot be treated as *certiorari*; and this discretion to convert and to apply practical processes arises in those cases where through inadvertence or a lack of procedural understanding the wrong course has been pursued where the judgment or decree, however just and free from error, cannot stand because it does not in fact have judicial support.

Such was the case in *Axley* v. *Hammock, Chancellor*, 185 Ark. 939, 50 S. W. 2d 608.[1] Compensation for damaged reputation was sought in Circuit Court from Southern Lumber Company on the ground that the corporation's president had uttered slanderous words injurious to the plaintiff Axley, a company employe. The defendant moved for a transfer to equity, alleging the plaintiff, as supervisor in charge of records, had acted fraudulently; that complicated accounts were involved, and that a master would be required to clarify. The prayer was granted, and in Chancery the plaintiff's motion to remand was overruled. From a decree finding there was no liability on either side and taxing costs equally, Axley prayed an appeal, but subsequently petitioned this Court for a writ of *certiorari* to quash the decree. The principal contention was that on the slander issue the plaintiff below had a constitutional right of trial by jury, hence Chancery, where the legal issue was tried by the Court, did not acquire jurisdiction. In the opinion, written by Mr. Justice MEHAFFY, there is reference to the rule announced in *Adams* v. *Sub-Drainage District No. 3*, 171 Ark. 802, 286 S. W. 962, where it was said that *certiorari* may not be used as a substitute for appeal, being a writ of discretion. After stating that in the case presented by Axley the writ could not be demanded as a matter of right, it was said that by parity of reasoning the respondent could not insist that it be not issued. When called upon to grant a writ of *certiorari*, or in response to the urge that it be denied, "Discretion," said Judge Mehaffy, "requires the judge or court to act according to the dictates . . . of their own judgment and con-

---

[1] In the Axley case the original petition to this Court was that a writ of *certiorari* issue, while in the instant proceeding we are treating the appeal as *certiorari*.

science, and it involves a fair consideration of all the peculiar features of the particular question involved.''

In *McCain, Labor Commissioner,* v. *Collins,* 204 Ark. 521, 164 S. W. 2d 448, *certiorari* was approved as the appropriate method of bringing to the attention of Circuit Court an order issued by the Merit System Council sustaining actions of the State Labor Commissioner in dealing with personnel. From a Circuit Court judgment reversing the Council the Commissioner appealed. The opinion sustaining the Council cites *Hall* v. *Bledsoe,* 126 Ark. 125, 189 S. W. 1041, and other cases, with emphasis on *Merchants & Planters Bank* v. *Fitzgerald,* 61 Ark. 605, 33 S. W. 1064.

We held in *Griffin* v. *Boswell,* 124 Ark. 234, 187 S. W. 165, that *certiorari* was the appropriate remedy to review a County Court's judgment where lack of jurisdiction was urged. To the same effect is *City of Fayetteville* v. *Baker,* 176 Ark. 1030, 5 S. W. 2d 302, where it was alleged that the trial court acted in excess of its jurisdiction.

However, a different rule applies where the subject matter ''is colorably within a court's general jurisdiction.'' *St. Louis, I. M. & S. Ry. Co.* v. *State,* 65 Ark. 200, 17 S. W. 806. In the latter case Mr. Justice HEMINGWAY said that the restricted office of the writ '' . . . precludes a review of such matters as, coming within the court's jurisdiction, were incorrectly determined.'' Continuing, the opinion contains the following: ''The petitioner had the right of appeal, which it does not appear to have lost by an unavoidable casualty. Such being true, *certiorari* can be invoked only to set aside a judgment rendered without jurisdiction. . . . Jurisdiction is defined to be 'the right to adjudicate concerning the subject matter in the given case. To constitute this there are three essentials. First, the court must have cognizance of the class of cases to which the one to be adjudged belongs. Second, the proper parties must be present. And third, the point decided must be, in substance and effect, within the issue.' . . . Where the court has a general cognizance over the class of cases to which that to be adjudged belongs, it has jurisdiction of the partic-

302

ular case upon a colorable presentation of the facts necessary to constitute it a member of the class."

*Reed* v. *Bradford,* 141 Ark. 201, 217 S. W. 11, presented a controversy, brought here on appeal, where in Circuit Court it had been sought by *certiorari* to quash a judgment rendered by Special County Judge J. W. Butt. The litigation involved a public road. It had been argued that the regular Judge, S. F. Dillard, was disqualified. The Governor, supposing Dillard's disqualification was unquestioned, issued a commission to Butt. Dillard, as the constitutional judge, and Butt, without insisting the commission was valid, rendered conflicting judgments. Those adhering to the decision rendered by Butt insisted that the Governor's commission, *prima facie,* constituted him a judge *de jure,* and his title to the office for the special purpose could be questioned only by the State in a *quo warranto* proceeding.

Disposing of this argument, Chief Justice McCULLOCH said: " . . . It is urged that this is a collateral attack on the judgment pronounced by the special judge, and that [the attack] cannot be sustained. The judgment is void on its face for the reason [that the regular judge was present, and acted as such in the identical matter on the day Butt attempted to serve, and this was reflected by the record], and *certiorari* in the Circuit Court which has supervisory jurisiction over inferior courts is the proper remedy, even though a remedy by appeal is also available."

Having reached the conclusion that *certiorari* is appropriate in the case at bar, and that matters included in the appeal record are all that pertain to the proceeding, and that nothing additional could be added if the writ were actually served, our inquiry goes to the question whether, with Act 42 before us, the decree relied upon by the appellee-respondent reflects a valid exercise of the judicial power.

In the volume on Judgments, Restatement of the Law, p. 45, the American Law Institute says that "if a person or body assumes to act as a court without any

semblance of legal authority so to act and gives a purported judgment, the judgment is, of course, wholly void. Such a judgment is open to collateral attack wherever in a judicial proceeding it is relied upon as a cause of action or defense. The judgments of a *de facto* court, however, are not void. Thus, judgments given by courts in the Confederate States during the Civil War were not open to collateral attack, even though after the termination of the war it was held that those courts were not legally constituted. So also, where a court is established by statute and operates thereunder as a *de facto* court, its judgments are not void although the statute is unconstitutional.''

Section 1 of Act 42 declares that ''hereafter there shall be an additional Chancellor for the First Chancery Circuit,'' whose jurisdiction, except on exchange, shall be confined to Pulaski County. Section 2 divides the circuit into two divisions ''to be known as the First Division and the Second Division of the First Chancery Circuit of Arkansas.'' Section 3 retains the Chancellor then serving as the Chancellor of the First Division.

Section 4 provides: ''The Chancellor of the 2nd Division . . . as herein created, shall be the present Master in Chancery of the Chancery Court of Pulaski County, who shall hold said office until January 1, 1949. At the General Election in November 1948, there shall be elected a Chancellor for said Second Division of the Chancery Court, who shall take office January 1, 1949, and whose term of office shall be six years. . . . Said Chancellor of the Second Division . . . shall hold court in the County of Pulaski, and in no other County of said Circuit. The compensation . . . shall be $4,800 per year until the General Election in November 1948, and thereafter it shall be $6,000 per year.''

Other provisions relate to the oath of office, records to be kept by the Clerk, (whose salary is fixed at $4,000 per annum) the appointment of a deputy to wait upon the court, appointment of a court reporter, continuing sittings of court, ordinary methods of appeal to the Supreme Court, a mandate to the County Judge to provide

appropriate quarters for the new court, authority to refer matters to a master—and finally (Sec. 12) a provision that "The invalidity of any section or sections of this Act shall not affect the validity of the balance of said enactment.

In examining the Act, of which we have judicial knowledge, it appears (1) that the General Assembly functioned in two respects: It exercised the inherent right to legislate, and then assumed the executive function of appointment—a power it did not possess. This being true, the so-called decree signed "Ruth F. Hale, Chancellor" imports no judicial authority and must be treated as a nullity.

Government as we know it—or at least as it *affects* us—is characterized by that fundamental division of power so often spoken of as the three coördinate departments—Legislative, Executive, Judicial. Each division functions in a separate, but restricted political area or sphere. Neither may be infringed upon by the other.

It would be much easier, from this Court's standpoint, to say that but little difference in the general scheme would be observed if we closed our eyes until November and permitted the legislative usurpation to take its course. A Chancery Court, efficiently presided over, dealing with a heavy daily docket, would be allowed to function in circumstances where it is said that relief is an emergency. Sec. 13, Act 42. But, unfortunately, the entire fabric of constitutional government is involved, and confession here that a meritorious case justifies sabotage of fundamentals can only have the effect of making government more difficult and justifying the public's all-too-often expressed fear that principles are lost by attrition more often than they are bartered for profit.

*Oates* v. *Rogers,* 201 Ark. 335, 144 S. W. 2d 457, illustrates the point. There the General Assembly enacted what could have been a valid measure to separate the offices of sheriff and collector in Pulaski County. But after performing the legislative requirements the Assembly delegated to the County Judge, the Chancellor, and the three Circuit Judges, authority to select a collector to

serve for a period of five years. The Supreme Court's holding was that because appointment is non-judicial, circuit and chancery judges are without power, under the constitution, to exercise that function—a duty expressly conferred upon the Governor. The limitation discussed by Judge RIDDICK in *Cox* v. *State,* 72 Ark. 94, 78 S. W. 756, 105 Am. St. Rep. 17, was mentioned in the Oates-Rogers opinion. That exception has no application here for the reason that Chancellors are State officers under the constitution; and by the same authority the Governor has the right to fill vacancies pending election. See, also, *Matthews* v. *Bailey, Governor,* 198 Ark. 830, 131 S. W. 2d 425.

The assertion that Mrs. Hale is a Chancellor *de jure* advances for consideration the argument that our Constitution invests the Governor with power to fill vacancies; for say proponents, since the Act that undertook to create the Chancery Division named an incumbent, no vacancy existed and the Executive has not been deprived of any right. The plausibility of this argument must yield to the practical mechanics of legislation which afforded the General Assembly every procedural convenience to establish the Division and at the same time produce a vacancy. Had that been done each governmental department—legislative and executive—would have acted in its accredited field, neither impinging upon the other.

The most difficult problem is whether, in spite of the severability provision of Sec. 12, the Division would have been created had the General Assembly realized the appointment was a nullity.

Argument that the creative sections—1, 2 and 3—would not have been enacted had it been known the vacancy could be filled only by executive appointment or election, finds support in the fact that the three sections lead logically into Section 4. It is our view that the Act was intended as a whole. It was a new departure. Legislators must have been cognizant of the unusual power they were attempting to exercise and unquestionably there was doubt regarding constitutionality of the method adopted; and yet, in spite of this, no alternative was ex-

pressed—only the provision for an election to be held more than twenty months in the future.

Amendment No. 29 to the Constitution directs the Governor to fill vacancies " . . . . in the office of United States Senator, and in all elective state, district, circuit, county, and township offices except those of Lieutenant Governor, Member of the General Assembly, and Representative in Congress of the United States," and (Sec. 2) " . . . No person appointed under Section 1 shall be eligible to appointment or election to succeed himself."

Under this discriminating provision appointment to a vacancy in the *circuit* for the term running between creation of the Division and election would have rendered such appointee ineligible as a candidate in succession; hence we must conclude that with the Amendment as a guide, and with a desire to promote to the Chancellorship the officer then serving as Master in Chancery, it was felt that the technical distinction between appointment to an office not previously existing, and appointment to fill an admitted vacancy, was a tenable assuasive, hence no vacancy as contemplated by Amendment No. 29 had been filled. This line of argument might easily lead one into infinite fields of inductive reasoning, but it could hardly eliminate from the Constitution the expressed intent that one invested with an office in any of the "circuits" whose right rests upon any security less than an election must stand aside as an ineligible when an election is legally held.

In considering arguments advanced by the respondent-appellee that the General Assembly did not intend to create an office and leave it vacant (for, they say—quoting from *Hutchenson* v. *Pitts*, 170 Ark. 248, 278 S. W. 639—" . . . it is an elementary principle that the law abhors vacancies in public office")—in this connection it is difficult to say that where so much attention was given to a proscribed method of appointment in an effort to prevent the office from being vacant until it could be filled by the Governor, February 7, 1947, the purpose was other than to adroitly blend the principal transaction

with incidental provisions, and thus retard or obscure recognition of the harmful element.

The right of a State Legislature to make appointments in circumstances where under the constitution that power was placed elsewhere was discussed by the Supreme Court of Indiana in three pertinent cases, one of which dealt with the judiciary. In *State of Indiana ex rel. Alvin P. Hovey* v. *William T. Noble et al.*, 118 Ind. 350, 21 N. E. 244, 4 L. R. A. 101, 10 Am. St. Rep. 143, consideration was given to the General Assembly's asserted right to create and name Commissioners of the Supreme Court. They were charged with the duty of aiding and assisting the Court under such rules and regulations as might be promulgated by that body, "and to aid and assist the Court in the performance of its duties."

The Supreme Court first held that the duties with which it was charged were created by the constitution, and that only judges whose offices were so created could collectively function as a court. In *State of Indiana ex rel. Henry Jameson et al.* v. *Caleb S. Denny et al.*, 118 Ind. 382, 21 N. E. 252, 4 L. R. A. 79, attention was called to Sec, 1, art. 3, of the Indiana Constitution, providing that "The powers of the government are divided into three separate departments: the legislative, the executive, including the administrative, and the judicial; and no person charged with official duties under one of these departments shall exercise any of the functions of another, except as in this Constitution expressly provided." Our Constitution (art. IV, Secs. 1 and 2) is: "The power of the government of the State of Arkansas shall be divided into three distinct departments, each of them to be confined to a separate body of magistry, to-wit: Those which are legislative to one, those which are executive to another, and those which are judicial to another. No person, or collection of persons, being one of these departments, shall exercise any power belonging to either of the others, except in the instances hereinafter expressly directed or permitted."

In the Jameson-Denny case the Indiana Court held that power vested in the legislature "to provide by law

the manner or mode of making an appointment to office, does not include the power to make the appointment."

In the Hovey-Noble case it was said concerning the commissioners: "If the duties assumed to be assigned [to them] are judicial, then they must constitute a court, since only courts can exercise judicial power. But, as no such court is recognized by the Constitution, it can have no legal existence. If, however, it be conceded that the tribunal which the Act assumes to establish is a court, then the instant the Act took effect the offices of the judges of that court were vacant." And, in respect of judicial power: " . . . It is the Constitution, and not the Legislature, which makes the investiture, and it is the courts and judges who are invested with [this] power." See *City of Evansville et al.* v. *State of Indiana, ex rel. Fred Blend,* 118 Ind. 426, 21 N. E. 267, 4 L. R. A. 93.

So, in the case at bar, the Constitution invests judicial power in courts, and it places appointive power with the Executive—certainly as to the enumerated offices. There is no color of right, no semblance of authority, no repository of power even inferentially hinted at in the Constitution, no fine shade of reason from which substance might spring, and no theory upon which those charged with promulgating the State's public policies and enacting its laws, can assign to themselves a duty expressly placed elsewhere by the very Constitution which created a legislative department.

Appellee-respondent argues that facts in *Keith* v. *State,* 49 Ark. 439, 5 S. W. 880, support the proposition that with creation of the Chancery Division in the instant case and the attempted appointment of a Chancellor, the person so designated became a *de facto* judge if not in fact *de jure.*

In the Keith case Judge R. H. Powell had been regularly elected to preside over the Third Judicial Circuit. The Fourteenth Circuit was subsequently created, involving a reassignment of counties. The legislative directive was that "The Circuit Judge elected at the last general election for the Third Circuit, whose residence

falls within the Fourteenth, as created by this Act, shall continue to exercise the functions of Circuit Judge for the Fourteenth Circuit until his successor is elected and qualified as now provided by law.''

By a plea to the Court's jurisdiction, and by subsequent plea in abatement when found guilty on a criminal charge, Keith undertook to question the Court's jurisdiction when his appeal was lodged in the Supreme Court. Chief Justice COCKRILL held that appeal was not the right remedy. It was also held that the record disclosed that Powell, if not a judge *de jure,* was a judge *de facto,* hence the conviction could not be attacked collaterally.

The difference between Keith's position and the situation here presented is that Powell, having been elected to the judgeship, was assigned to a different district, but nevertheless he had been elected. His judicial status was created by machinery set in motion by the Constitution. He was a regular judge who had been duly commissioned and had taken the oath of office; hence his acts in a particular case were subject to review at the instance of the State only.

In the absence of election to office (however defectively the election may have been held) one may claim to be a *de facto* officer by virtue of appointment only in the event the appointing power had authority or apparent authority to make the designation. If the agency lacked the actual or ostensible authority to appoint in any circumstance, its appointee cannot be considered a *de facto* officer. This is true because the attempt would not be the proper exercise of an existing power, but an effort to exercise a non-existent power.

Conditions under which a judgment is absolutely void were discussed by Chief Justice BUNN in *Caldwell v. Barrett,* 71 Ark. 310, 74 S. W. 748. The following language is found in the opinion:

''In order to be a *de facto* judge there must be a regularly constituted office and a vacancy therein before one appointed or elected to fill such office can be denominated a *de facto* officer. . . . When there is an office, and no *de jure* officer to exercise its functions, then one ap-

pointed under the form of law would be a *de facto* officer at least, and his acts are not to be called in question collaterally. The question is quite different where there is no *de jure* office, . . . for the foundation of the proceeding must be . . . a lawfully created court, or there is a total want of jurisdiction in the court itself to hear and determine the case, and this jurisdictional infirmity will annul any proceedings therein on mere suggestion to the proper court. It would be beyond all precedent to term the judge presiding in a court which is not a court at all a *de facto* judge.''

And, for the same reason, one appointed to an office that does exist, *but not appointed under form of law,* would not be a *de facto* officer.

Result of our holding is (a) that in spite of words of severability used in Act 42, the General Assembly did not intend that the office it attempted to create should be filled by executive appointment, hence there was no distinct or independent purpose to divide the circuit or district and leave the office vacant for almost two years, and (b) not having the power of appointment, the Legislature could not lend color to acts of the person named; hence, judgments, orders, and decrees are without legal force. It follows that the decree must be vacated, but inasmuch as the cause was filed in Pulaski Chancery Court, which is unaffected by the legislation, it is remanded for consideration.

Cause No. 8371 (*Helen D. Stevens v. Arthur G. Stevens*) is another appeal from the Second Division, submitted December 8, 1947. The decree there, also, must be set aside and the cause remanded to Pulaski Chancery Court.

Mr. Justice McFADDIN and Mr. Justice MILLWEE dissent. Mr. Justice McHANEY was absent and did not participate in the consideration or determination of the case

ED. F. McFADDIN, Justice (dissenting). The majority—as I read the opinion—is holding (a) that all of Act 42 of 1947 (hereinafter referred to as ''Act 42'') is void because of Section 4 of the Act, and (b) that the Second

Division of the First Chancery District is not even a *de facto* court, and that Judge Ruth F. Hale, Chancellor of the court, is not even a *de facto* judge. The effect of this holding is to render void *ab initio* all of the judgments and decrees that Judge Hale has rendered. The majority opinion is sweeping and far reaching; I dissent from each and both of the conclusions reached by the majority.

The Legislature certainly had the right to create the Second Division Court of the First Chancery Circuit. Act 42, with the exception of § 4, is patterned after and is entirely similar to Act 372 of 1923 (hereinafter referred to as "Act 372"), which created the Second Division Court of the Seventh Chancery Circuit. The validity of the said Act 372 was upheld by this court in the case of *Gordon* v. *Reeves,* 166 Ark. 601, 267 S. W. 133. A comparison of the two Acts leads to the inevitable conclusion that the purpose of Act 42 was to relieve the congestion existing in the Pulaski Chancery Court, just as Act 372 was to relieve the congestion existing in the chancery courts of Union and Ouachita Counties, which were only two of the several counties in the Seventh Chancery Circuit. If the purpose of Act 372 was to relieve the congestion in the chancery court, how can the majority say in the case at bar that the primary purpose of Act 42 was to elevate Judge Ruth F. Hale to the position of Chancellor? And, yet, that is what the majority opinion means. Otherwise, the majority would have given some effect and significance to § 12 of Act 42, which section reads:

"The invalidity of any section or sections of this Act shall not affect the validity of the balance of said enactment."

I think § 4 of Act 42 is unconstitutional, in that the Legislature attempted to fill a vacancy. But I think that with § 4 stricken from the Act, there still remains a valid, legal and workable Act. It is the duty of this court, in construing a legislative enactment, to give effect to the valid portions of the Act. See *State* v. *Marsh,* 37 Ark. 356; *State* v. *Byles,* 93 Ark. 612, 126 S. W. 94, 37 L. R. A.,

N. S. 774; *Cotham* v. *Coffman,* 111 Ark. 108, 163 S. W. 1183; *Mississippi Co.* v. *Green,* 200 Ark. 204, 138 S. W. 2d 377; *Stanley* v. *Gates,* 179 Ark. 886, 19 S. W. 2d 1000. Other cases on this point are collected in West's Arkansas Digest, Statutes, § 64. In *Mississippi Co.* v. *Green, supra,* this court found that § 10 of Act 452 of 1917 (concerning the qualifications of judges of the county, probate and common pleas courts in Mississippi county) was unconstitutional. Yet, with that section stricken, this court held that the remainder of the Act was valid, legal and workable. I think the same rule should be applied in the case at bar. Other cases—involving courts and judicial officers, and in which this court has stricken the illegal provisions and enforced the remainder of the Act—are collected in West's Arkansas Digest, Statutes, § 64(3).

Here is the way that Act 42 is valid, legal and workable, with § 4 stricken, to-wit: the remaining sections of the Act create the Second Division of the First Chancery Circuit; provided that there shall be an additional chancellor; prescribe the duties of the chancellor and the oath of office to be taken; etc., etc. In the case of *State ex rel. Wood* v. *Cotham,* 116 Ark. 36, 172 S. W. 260, there was created a new judicial circuit. The question was as to the vacancy, and the method of filling it, and this court said:

"It is conceded by learned counsel on both sides that the creation of the new judicial circuit caused a vacancy to exist, within the meaning of the Constitution, in the office of judge of that circuit. This court has so decided. *State ex rel. Smith* v. *Askew,* 48 Ark. 82, 2 S. W. 349.

"It will be noted that the Legislature authorized only a temporary filling of that vacancy by executive appointment, and left the succession to be supplied in conformity to existing laws without attempting to define or to reiterate them. The lawmakers could not have done otherwise, for the tenure of office and the method of filling a vacancy is unalterably fixed by the Constitution. *Cobb* v. *Hammock,* 82 Ark. 584, 102 S. W. 362; *State*

*ex rel. Attorney General* v. *Stevenson,* 89 Ark. 31, 116 S. W. 202."

So, here, it was unnecessary for the Legislature to say anything as to how the vacancy in the office should be filled. The vacancy existed immediately when the Act became a law; and the Constitution directed how the vacancy should be filled, *i. e.,* by appointment of the governor. In the light of the last-cited case, Act 42 is certainly a valid, legal and workable Act, with all of § 4 stricken. So, there should be a valid *de jure* court. Yet, the majority strikes down the entire Act because of § 4.

My next point is, that with a valid legal, *de jure* court created, then Judge Ruth F. Hale, in presiding over that court, under commission, was certainly a *de facto* judge. In 46 C. J. 1057, in stating who is a *de facto* officer, this is given as the rule:

"One who holds an office under an appointment or election giving color of title may be a *de facto* officer, although the appointment or election is irregular, or invalid, or although he has been appointed by an authority not competent under the law to make the appointment, and even though his title is derived from an unconstitutional statute."

The records in the office of the Secretary of State (and we take judicial notice of these records) show that on February 8, 1947, a commission issued to Ruth F. Hale as chancellor of the Second Division of the First Chancery Circuit; and that she took the oath in legal form as "chancellor of the Second Division of the First Chancery Circuit of Pulaski county for the term ending January 1, 1949." The oath of office was filed the same day in the office of the Secretary of State, and the record there shows that she "qualified" on February 8, 1947. She certainly then became a *de facto* judge, and her situation is not one whit different from the situation of Judge Powell in the case of *Keith* v. *State,* 49 Ark. 439, 5 S. W. 880. The majority differentiates the above case from the case at bar on grounds that do not appear to me to find support in the Keith case.

Here is the way I understand *Keith* v. *State*: Judge R. H. Powell, at the regular election in 1886, was elected judge of the Third Judicial Circuit. The Legislature, by Act of May 3, 1887, created the Fourteenth Judicial Circuit from some of the counties formerly in the Third and Fourth Judicial Circuits. The 1887 Act prescribed:

"Section 9. That the Circuit Judge elected at the last general election for the Third Circuit, whose residence falls within the Fourteenth, as created by this Act, shall continue to exercise the functions of Circuit Judge for the said Fourteenth Circuit until his successor is elected and qualified as now provided by law."

In other words, the 1887 Act created the Fourteenth Circuit, and designated the judge of that circuit by reference to his residence. (That is what Act 42 does, *i. e.*, it creates the Second Division of the First Chancery Circuit, and designates the chancellor by reference to her former position.) In July, 1887, Judge Powell held court for the Fourteenth Circuit in Boone county (a county formerly in the Fourth Circuit, so Judge Powell could preside over that court only because of the 1887 Act). Keith was convicted of second degree murder; and he raised in the trial court the question that Judge Powell was not legally the judge of the Fourteenth Circuit, and therefore could not pronounce sentence on him.

Chief Justice COCKRILL, speaking for this court in the Keith case, said that Judge Powell was at least "the judge *de facto* of the circuit in which the appellant was convicted." Chief Justice COCKRILL further said:

"The principle that the acts of an officer *de facto* are binding upon the public as though done by one in office *de jure,* and that his right to the office cannot be questioned except in a direct proceeding to which he is a party, is well settled and is not new in this court. *Moore, as Adm'r.* v. *Turner,* 43 Ark. 243; *Pearce* v. *Edington,* 38 Ark. 150; *Kaufman* v. *Stone,* 25 Ark. 336; *Caldwell* v. *Bell & Graham,* 3 Ark. 419; S. C., 6 *id.*, 227; *Hildreth's Heirs* v. *McIntire's Devisees,* 1 J. J. Marsh, 206, 19 Am. Dec., 61, and note."

Cases from Pennsylvania, Massachusetts, New York and other jurisdictions were reviewed, all supporting the holding that a person presiding over a court legally established was in fact a *de facto* judge. The holding in the case of *Keith* v. *State* was not based on the premise that Judge Powell had been elected to some office (as the majority seems to differentiate it here); because he had been elected to an office entirely distinct from the one which he was seeking to hold. The rule announced in *Keith* v. *State* is the rule generally. In 15 C. J. 874, this is given as the general rule:

"Where a court has been established by an Act of the legislature apparently valid, and has gone into operation under such Act, it is to be regarded as a court *de facto,* and where the organization of a court is authorized by law, a court organized thereunder is at least a *de facto* court, although it is defectively organized. . . . The legality of the existence of a *de facto* court and its right to exercise its functions cannot be inquired into collaterally, but only in a direct proceeding at the instance of the State. Neither can the question of the legal existence of a trial court be raised by appeal."

Without lengthening this dissent, it is my settled view that, with § 4 of Act 42 stricken, the remaining sections leave a valid, legal and workable Act; and that Judge Ruth F. Hale is certainly a *de facto* judge, and, as such, her acts cannot be questioned in the type of case here presented.

For the reasons herein stated, I respectfully dissent from the holding of the majority, and I am authorized to state that Mr. Justice MILLWEE joins me in this dissent.

McHANEY, Justice, dissenting. On account of illness I "was absent and did not participate in the consideration or determination of the case," as noted in the majority opinion. I have participated in the consideration of this consolidated case on rehearing and I now desire to dissent from the holdings as expressed in the majority opinion.

I agree with everything that was said in the minority opinion and disagree on every point with the majority, except the holding that § 4 of Act 42 is invalid. The holding of the majority that the appeals in the two cases, which were consolidated here for consideration, could be treated as petitions for *certiorari* and quashed as void judgments, is without authority to support it. The cases cited are not in point. Here, the title to the office is raised and determined, when the incumbent is not made a party and given a chance to defend her title. This cannot be done except in the case of an intruder or usurper without any color of right to the office. In *Levy, Admr.* v. *Lychinski,* 8 Ark. 113, this court said: "A writ of *certiorari* is not a proceeding against the tribunal or individual composing it; it acts upon the cause or proceedings in the inferior court, and removes it into a superior tribunal for reinvestigation. The jurisdiction so acquired is appellate and not original."

In 14 C. J. S., *Certiorari,* § 28, it is said: "It appears to be the general rule that *certiorari* will not lie to try title to office, or where the determination of the right to office is the obvious and only object of the writ, and this is so even though the parties to the writ consent. In such cases *quo warranto* is the proper remedy."

So, it is my opinion that this court should not have considered and decided the title to the office in a divorce case which came here on appeal and in which the right of the incumbent to the office was not raised on the trial, but here for the first time, and the judge not being a party to the action in any way. The title to the office could only be determined by *quo warranto* in a proceeding by the State at the instance of the Attorney General.

The majority also holds that the legislature would not have passed Act 42, without § 4, the appointing section. It is said that §§ 1, 2 and 3, the sections that created the Second Division of the Pulaski Chancery Court, "lead logically into § 4. It is our view that the Act was intended as whole." What right the majority had to say, as it did in effect, that the legislature

would not have enacted Act 42 without § 4 in it, I am unable to determine. The legislature itself said it would. It said so in § 12 by saying: "The invalidity of any section or sections of this Act shall not affect the validity of the balance of said Act." How can the majority say the legislature did not mean what it said? The appointment of Ruth Hale in § 4 was incidental to the Act as a whole and the reason for the Act was stated in § 13 to be: "The docket of the present Chancery Court of Pulaski county is so crowded that it is impossible for one chancellor to hear all the cases without undue delay in some of them, in view of the fact that said chancellor has to devote much of his time to the holding of the Chancery Courts in the other three counties of said circuit; therefore, this Act is necessary for the immediate preservation of the public peace and safety and said Act shall take effect and be in force from and after its passage, and all laws and parts of laws in conflict herewith are hereby repealed."

Was the appointee a *de facto* judge? This question was discussed in the dissenting opinion. Of course, it was necessary for the majority to hold the whole of Act 42 to be void in order to arrive at the conclusion that the appointee was not a *de facto* judge, for once it is admitted that the Act did create the Second Division of said court, a power the legislature concededly had, it necessarily follows that the appointee, no matter how defective the appointment, is a *de facto* judge. In Vol. 43, Am. Jur. p. 224, § 470, it is said: "The *de facto* doctrine was ingrafted upon the law as a matter of policy and necessity, to protect the interests of the public and individuals involved in the official acts of persons exercising the duty of an officer without actually being one in strict point of law. It was seen that it would be unreasonable to require the public to inquire on all occasions into the title of an officer, or compel him to show title, especially since the public has neither the time nor opportunity to investigate the title of the incumbent. The doctrine rests on the principle of protection to the interests of the public and third parties, not to protect or vindicate the acts or rights of the particular *de facto*

officer or the claims or rights of rival claimants to the particular office. The law validates acts of *de facto* officers as to the public and third persons on the ground that, although not officers *de jure*, they are, in virtue of the particular circumstances, officers in fact whose acts public policy requires should be considered valid.

"Judicial as well as ministerial officers may be officers *de facto*, within the rule, hereafter considered, that the acts of a *de facto* officer are valid as to the public and third persons."

The majority have nullified hundreds of divorce decrees, decrees concerning property rights, alimony, support and custody of children. It has invalidated all subsequent marriages of divorced spouses and may have rendered them bigamous. Titles to real property have been clouded, and conveyances of homesteads subsequently by the husbands *of such divorcees* have been nullified where the wives did not join in such conveyances. It is impossible to predict all the disastrous results that will attend this holding. Yet all the parties to such litigation were perfectly innocent. These are the considerations that gave rise to the *de facto* doctrine. "The principle is founded," said the New York Court in *Curtin* v. *Barton*, 135 N. Y. 505, 34 N. E. 1093, "on considerations of public policy, and its maintenance is essential to the preservation of order, the security of private rights, and the due enforcement of the law. . . . The incumbent of the office is not a party to this action. His title to the office is not in question directly, as in the cases where an action in the nature of a *quo warranto* is brought by the attorney general, or where he brings the suit himself to recover the salary. When a court with competent jurisdiction is duly established, a suitor who resorts to it for the administration of justice and the protection of private rights should not be defeated or embarrassed by questions relating to the title of the judge, who presides in the court, to his office. If the court exists under the constitution and laws, and it had jurisdiction of the case, any defect in the election or mode of appointing the judge is not available to litigants."

Our own decisions, as well as those of all other courts, are to the same effect. In *Keith* v. *State,* 49 Ark. 439, 5 S. W. 880, Chief Justice COCKRILL for the court quoted with approval from *Clark* v. *Commonwealth,* 29 Penn., St., 129, the following: "A very important question upon the constitutional power of the Legislature so as to alter judicial districts as to transfer a Judge to the courts of certain counties who was never voted for in those counties, was intended to be raised by this plea; but, unfortunately for the prisoner, it cannot be raised in this form. His plea admits that Judge Jordan (before whom the trial was had) 'is a Judge *de facto*'; and if he did not admit this we would take judicial notice of the legislation which placed him in the courts of Montour county, so far as to hold him to be a judge *de facto.* That legislation is at least a colorable title to his office. Can the right and power of a judge *de facto,* with color of title, be questioned in any other form than by *quo warranto,* at the suit of the Commonwealth? Assuredly not." See, also, the additional quotations from the Keith case and other cases cited in the dissenting opinion by Mr. Justice McFADDIN.

So, here, the legislation, Act 42, constituted at least colorable title to the office held by the appointee and she was at least a *de facto* judge, and the right and power of a judge *de facto,* with color of title, cannot be questioned by a litigant in that court and can only be questioned by *quo warranto.* The appointee in *quo warranto* is made a defendant and is given the right to defend his title, a fundamental right that has not heretofore been denied a *de facto* officer. See *Scott* v. *McCoy,* 212 Ark. 574, 206 S. W. 2d 440.

Persons going into a regularly constituted court to settle private rights ought not to be required to inquire into the right of the presiding judge to hold the office at their peril. They have the right to assume that a judge of a court of competent jurisdiction is entitled to the office either *de jure* or *de facto,* and that its judgments and decrees are valid. Private litigation would never be determined if every litigant could question the right of the judge to be a judge.

The majority opinion as originally written does not refer to the case of *State* v. *Green and Rock,* 206 Ark. 361, 175 S. W. 2d 575, but it was mentioned in consultation on rehearing as being an authority to support the opinion. I do not think so. That is the case where the Governor, pursuant to Act 290 of 1943, appointed Walter N. Killough as temporary Circuit Judge, while his brother, Neill Killough, the regular Circuit Judge, was serving in the armed forces of the U. S. The court held §§ 1 and 2 of said Act 290 unconstitutional and that the appointee was not a *de jure* judge. The concluding sentence of the opinion by the late Judge Knox reads: "We conclude that the judge granting the writ (Walter N. Killough) was not a judge *de jure* by virtue of his appointment under the authority of the Act, and this is the only question we are asked to decide." Mr. Justice Frank G. Smith and I dissented in that case, and the question of whether Walter N. Killough was a *de facto* judge was not raised or decided. That was a *habeas corpus* case where the judge granted the writ over the State's objections and the State appealed. This court treated the appeal as being in the nature of *quo warranto,* to try the title to the office. It was the State's action and not that of a private litigant so it cannot be any auhority to sustain the present holding, where private litigants are permitted to question the title of office.

Realizing as I do, the serious and perhaps unsolvable predicament into which literally hundreds, if not thousands, of innocent litigants find themselves as a result of this decision, and believing that it is unsound and not at all necessary or proper to so hold, I most respectfully dissent. A rehearing should be granted. Justices McFaddin and Millwee expressed their views in the dissent to the original opinion and they also concur in the views here expressed.