POPE *v.* POPE.[*]

4-8602 210 S. W. 2d 319

Opinion delivered April 19, 1948.

*George W. Shepherd,* for appellant.

*Sam Robinson,* for appellee.

SMITH, J. My vote was required, and was cast, to make the opinion in the cases of *Howell* v. *Howell,* and *Stevens* v. *Stevens, ante,* p. 298, 208 S. W. 2d 22, and I assume my full share of responsibility for the opinion in those cases, but having reached the conclusion that it is unsound, I am now voting to overrule it.

On the authority of the case of *Caldwell* v. *Barrett,* 71 Ark. 310, 74 S. W. 748, it was held that there could not be a *de facto* judge unless there was a *de jure* office, and I do not recede from that view. But was there a *de jure* office? This I think is the controlling question in the case. This question has given me the greatest concern, and I

[*] See *Howell* v. *Howell, ante,* p. 298.

have endeavored very diligently to answer and refute the arguments contained in the dissenting opinions of Justices McHaney and McFaddin that there was a *de jure* office, but I have been unable to find a satisfying answer to the arguments of those judges, and I am now agreeing with them that there was a *de jure* office. Whether there was a *de jure* office of Chancellor of the Second Division of the Chancery Court, depends on the answer to the question, whether the provisions of Act 42 of the Acts of 1947 are separable. If they are not, as the original opinion held, the Act must fall, as there is no difference of opinion about § 4 of the act, which named Judge Hale as Chancellor, being unconstitutional. The original opinion held that it was beyond the power of the General Assembly to create a constitutional office and name a person to fill it, and I have not receded from that view, which indeed is the opinion of all the members of the court. Judge Hale was not therefore Chancellor *de jure,* but was she a Chancellor *de facto*? The arguments of the dissenting judges and the authorities cited by them in support thereof, which I shall not repeat or review here, convince me that Judge Hale was a Chancellor *de facto,* if the provisions of Act 42 are separable.

The court was created by the first three sections of Act 42, which were patterned after Act 372 of Acts of 1923. This last named Act, in its first three sections, added an additional Chancellor to the Seventh Chancery District, and gave that official jurisdiction in only two of the counties comprising that district. The validity of this Act 372 was upheld in the case of *Gordon* v. *Reeves,* 166 Ark. 601, 267 S. W. 133. If that case is to be followed, the first three sections of Act 42 created the second division of the Pulaski Chancery Court, which court is now in existence, if the provisions of Act 42 are separable.

By § 12 of Act 42, the provisions thereof are made separable by enacting that the invalidity of any section or sections of the Act shall not affect the validity of the balance of said Act. In view of this definite statement of the legislative intent, I have concluded that we have

no power to say that the Legislature did not mean what it said. Numerous acts have been passed containing provisions similar to § 12 of Act 42, and these acts have been upheld, after eliminating any unconstitutional part of the act, provided the part which remained after striking down the unconstitutional portions thereof left a workable act. See cases cited in the dissenting opinion of Justice McFADDIN. Here we have an act which creates a court, if the case of *Gordon* v. *Reeves, supra,* is followed, and when the unconstitutional provisions of the act are stricken, we have an office without a Judge, which may be filled in the manner provided by the Constitution, that is, by appointment of the Governor.

An attempt was made in this case to validate a decree of divorce rendered appellee by Judge Hale. In my opinion it was beyond the power of the Chancellor to do this. He could, of course, hear the testimony on which the original decree was rendered, or hear other testimony showing grounds for divorce, and grant one, but he could not by *nunc pro tunc* order validate the divorce decree, if it was invalid when rendered.

Now the effect of the change of my vote is to hold that these decrees rendered by a *de facto* Chancellor were valid, and do not require a *nunc pro tunc* order to sustain their validity. The decree from which is this appeal sustaining appellee's divorce is therefore affirmed, not on the ground that a void decree could be cured by *nunc pro tunc* order, but is affirmed upon the ground that the decree was not void, and does not require validation.

Decree affirmed. Chief Justice GRIFFIN SMITH and Justice ROBINS dissent.

GRIFFIN SMITH, Chief Justice, dissenting. The decisions in *Howell* v. *Howell* and *Stevens* v. *Stevens,* were made January 12. They were concurred in by four judges after the most painstaking consideration and diligent research, and with full comprehension of what the results would be. All of the arguments now adopted to overrule what was said to be sound reason for the determination then made were before the Court, and were rejected be-

cause, as it was said, a fundamental principle could not be the subject of judicial expedition. The following paragraph summarized our feelings regarding the law:

"It would be much easier, from this Court's standpoint, to say that but little difference in the general scheme would be observed if we closed our eyes until November and permitted the legislative usurpation to take its course. . . . But, unfortunately, the entire fabric of constitutional government is involved, and confession here that a meritorious case justifies sabotage of fundamentals can only have the effect of making government more difficult and justifying the public's all-too-often expressed fear that principals are lost by attrition more often than they are bartered for profit."

A substantial contingent of the vocal public has long felt that in matters affecting influential social or political groups, *pressure* from without can be brought to bear upon courts. The result of today's recantation, and the swing *from right to left*, will inevitably have the effect of accentuating this presumptively untenable belief. From the hour the two opinions were handed down, interested persons and their voluble sympathizers have maintained a continuous and persistent barrage of propaganda against the law as interpreted by the court's majority. Few avenues of so-called "approach" have been left untried. Now, since the purpose these interests had in view has been achieved by methods other than the judicial process, rightly or wrongly the result will be attributed to the Unofficial Court of Private Clamor.

The majority's opinion of January 12th, now becomes a part of the dissenting opinion of the Chief Justice. The Court then said:

On the appellant's allegation [in *Howell* v. *Howell*] that the decree was void, we treat the cause as having been brought up by *certiorari*.

Ruth Howell, plaintiff below, procured from the Second Division of Pulaski Chancery Court a decree of divorce from George Howell, the latter having declined

to defend until enforcement of the decree was undertaken. He then asserted invalidity of Act No. 42 of 1947. . . .

Appellee's first contention is that the Court's status, not having been raised at trial, cannot be considered here. It is argued that *quo warranto* is the exclusive method for questioning acts of an official; and, it is urged, the present proceeding, being a collateral attack upon an order regular on its face, the decree must be treated with that respect due judgments of all courts of record, hence the only matters subject to review are errors assigned as grounds for reversal.

The right of a supervising court to deal with a particular proceeding in a manner consistent with justice and to thereby expeditiously dispose of issues is unquestioned where recourse to the procedure is not prejudicial to one who is not immediately before the appellate court and where there is no statutory or constitutional impediment. If the result arrived at is the only one that in any event could be reached, the party indirectly affected is not injured. To this end appeal may be treated as *certiorari*. The writ may not be used as a substitute for appeal. It is insufficient because only the face of the record and matters of which the appellate court takes judicial notice may be considered. But it does not follow that an appeal cannot be treated as *certiorari;* and this discretion to convert and to apply practical processes arises in those cases where through inadvertence or a lack of procedural understanding the wrong course has been pursued where the judgment or decree, however just and free from error, cannot stand because it does not in fact have judicial support.

Such was the case in *Axley* v. *Hammock, Chancellor,* 185 Ark. 939, 50 S. W. 2d 608.[1] Compensation for damaged reputation was sought in Circuit Court from Southern Lumber Company on the ground that the corporation's president had uttered slanderous words injurious to the plaintiff Axley, a company employe. The defendant moved for a transfer to equity, alleging the plaintiff,

---

[1] In the Axley case the original petition to this Court was that a writ of *certiorari* issue, while in the instant proceeding we are treating the appeal as *certiorari*.

as supervisor in charge of records, had acted fraudulently; that complicated accounts were involved, and that a master would be required to clarify. The prayer was granted, and in Chancery the plaintiff's motion to remand was overruled. From a decree finding there was no laibility on either side and taxing costs equally, Axley prayed an appeal, but subsequently petitioned this Court for a writ of *certiorari* to quash the decree. The principal contention was that on the slander issue the plaintiff below had a constitutional right of trial by jury, hence Chancery, where the legal issue was tried by the Court, did not acquire jurisdiction. In the opinion, written by Mr. Justice MEHAFFY, there is reference to the rule announced in *Adams* v. *Sub-Drainage District No. 3,* 171 Ark. 802, 286 S. W. 962, where it was said that *certiorari* may not be used as a substitute for appeal, being a writ of discretion. After stating that in the case presented by Axley the writ could not be demanded as a matter of right, it was said that by parity of reasoning the respondent could not insist that it be not issued. When called upon to grant a writ of *certiorari,* or in response to the urge that it be denied, "Discretion," said Judge Mehaffy, "requires the judge or court to act according to the dictates . . . of their own judgment and conscience, and it involves a fair consideration of all the peculiar features of the particular question involved."

In *McCain, Labor Commissioner,* v. *Collins,* 204 Ark. 521, 164 S. W. 2d 448, *certiorari* was approved as the appropriate method of bringing to the attention of Circuit Court an order issued by the Merit System Council sustaining actions of the State Labor Commissioner in dealing with personnel. From a Circuit Court judgment reversing the Council the Commissioner appealed. The opinion sustaining the Council cites *Hall* v. *Bledsoe,* 126 Ark. 125, 189 S. W. 1041, and other cases, with emphasis on *Merchants & Planters Bank* v. *Fitzgerald,* 61 Ark. 605, 33 S. W. 1064.

We held in *Griffin* v. *Boswell,* 124 Ark. 234, 187 S. W. 165, that *certiorari* was the appropriate remedy to review a County Court's judgment where lack of jurisdiction was urged. To the same effect in *City of Fayetteville* v.

*Baker,* 176 Ark. 1030, 5 S. W. 2d 302, where it was alleged that the trial court acted in excess of its jurisdiction.

However, a different rule applies where the subject matter "is colorably within a court's general jurisdiction." *St. Louis, I. M. & S. Ry. Co.* v. *State,* 55 Ark. 200, 17 S. W. 806. In the latter case Mr. Justice HEMINGWAY said that the restricted office of the writ " . . . precludes a review of such matters as, coming within the court's jurisdiction, were incorrectly determined." Continuing, the opinion contains the following. "The petitioner had the right of appeal, which it does not appear to have lost by an unavoidable casualty. Such being true, *certiorari* can be invoked only to set aside a judgment rendered without jurisdiction. . . . Jurisdiction is defined to be 'the right to adjudicate concerning the subject matter in the given case. To constitute this there are three essentials. First, the court must have cognizance of the class of cases to which the one to be adjudged belongs. Second, the proper parties must be present. And third, the point decided must be, in substance and effect, within the issue.' . . . Where the court has a general cognizance over the class of cases to which that to be adjudged belongs, it has jurisdiction of the particular case upon a colorable presentation of the facts necessary to constitute it a member of the class."

*Reed* v. *Bradford,* 141 Ark. 201, 217 S. W. 11, presented a controversy, brought here on appeal, where in Circuit Court it had been sought by *certiorari* to quash a judgment rendered by Special County Judge J. W. Butt. The litigation involved a public road. It had been argued that the regular Judge, S. F. Dillard, was disqualified. The Governor, supposing Dillard's disqualification was unquestioned, issued a commission to Butt. Dillard, as the constitutional judge, and Butt, without insisting the commission was valid, rendered conflicting judgments. Those adhering to the decision rendered by Butt insisted that the governor's commission, *prima facie,* constituted him a judge *de jure,* and his title to the office for the special purpose could be questioned only by the State in a *quo warranto* proceeding.

Disposing of this argument, Chief Justice McCulloch said: " . . . It is urged that this is a collateral attack on the judgment pronounced by the special judge, and that [the attack] cannot be sustained. The judgment is void on its face for the reason [that the regular judge was present, and acted as such in the identical matter on the day Butt attempted to serve, and this was reflected by the record], and *certiorari* in the Circuit Court which has supervisory jurisdiction over inferior courts is the proper remedy, even though a remedy by appeal is also available."

Having reached the conclusion that *certiorari* is appropriate in the case at bar, and that matters included in the appeal record are all that pertain to the proceeding, and that nothing additional could be added if the writ were actually served, our inquiry goes to the question whether, with Act 42 before us, the decree relied upon by the appellee-respondent reflects a valid exercise of the judicial power.

In the volume on Judgments, Restatement of the Law, p. 45, the American Law Institute says that "if a person or body assumes to act as a court without any semblance of legal authority so to act and gives a purported judgment, the judgment is, of course, wholly void. Such a judgment is open to collateral attack wherever in a judicial proceeding it is relied upon as a cause of action or defense. The judgments of a *de facto* court, however, are not void. Thus, judgments given by courts in the Confederate States during the Civil War were not open to collateral attack, even though after the termination of the war it was held that those courts were not legally constituted. So, also, where a court is established by statute and operates thereunder as a *de facto* court, its judgments are not void although the statute is unconstitutional."

Section 1 of Act 42 declares that "hereafter there shall be an additional Chancellor for the First Chancery Circuit," whose jurisdiction, except on exchange, shall be confined to Pulaski County. Section 2 divides the circuit into two divisions "to be known as the First Divi-

sion and the Second Division of the First Chancery Circuit of Arkansas.'' Section 3 retains the Chancellor then serving as the Chancellor of the First Division.

Section 4 provides: ''The Chancellor of the 2nd Division . . . as herein created, shall be the present Master in Chancery of the Chancery Court of Pulaski County, who shall hold said office until January 1, 1949. At the General Election in November 1948, there shall be elected a Chancellor for said Second Division of the Chancery Court, who shall take office January 1, 1949, and whose term of office shall be six years. . . . Said Chancellor of the Second Division . . . shall hold court in the County of Pulaski, and in no other County of said Circuit. The compensation . . . shall be $4,800 per year until the General Election in November 1948, and thereafter it shall be $6,000 per year.''

Other provisions relate to the oath of office, records to be kept by the Clerk, (whose salary is fixed at $4,000 per annum) the appointment of a deputy to wait upon the court, appointment of a court reporter, continuing sittings of court, ordinary methods of appeal to the Supreme Court, a mandate to the County Judge to provide appropriate quarters for the new court, authority to refer matters to a master—and finally (Sec. 12) a provision that ''The invalidity of any section or sections of this Act shall not affect the validity of the balance of said enactment.

In examining the Act, of which we have judicial knowledge, it appears (1) that the General Assembly functioned in two respects: It exercised the inherent right to legislate, and then assumed the executive function of appointment—a power it did not possess. This being true, the so-called decree signed ''Ruth F. Hale, Chancellor'' imports no judicial authority and must be treated as a nullity.

Government as we know it—or at least as it *affects* us—is characterized by that fundamental division of power so often spoken of as the three coördinate departments—Legislative, Executive, Judicial. Each division

functions in a separate, but restricted political area or sphere. Neither may be infringed upon by the other.

It would be much easier, from this Court's standpoint, to say that but little difference in the general scheme would be observed if we closed our eyes until November and permitted the legislative usurpation to take its course. A Chancery Court, . . . dealing with a heavy daily docket, would be allowed to function in circumstances where it is said that relief is an emergency. Sec. 13, Act 42. But, unfortunately, the entire fabric of constitutional government is involved, and confession here that a meritorious case justifies sabotage of fundamentals can only have the effect of making government more difficult and justifying the public's all-too-often expressed fear that principles are lost by attrition more often than they are bartered for profit.

*Oates* v. *Rogers,* 201 Ark. 335, 144 S. W. 2d 457, illustrates the point. There the General Assembly enacted what could have been a valid measure to separate the offices of sheriff and collector in Pulaski County. But after performing the legislative requirements the Assembly delegated to the County Judge, the Chancellor, and the three Circuit Judges, authority to select a collector to serve for a period of five years. The Supreme Court's holding was that because appointment is non-judicial, circuit and chancery judges are without power, under the constitution, to exercise that function—a duty expressly conferred upon the Governor. The limitation discussed by Judge RIDDICK in *Cox* v. *State,* 72 Ark. 94, 78 S. W. 756, 105 Am. St. Rep. 17, was mentioned in the Oates-Rogers opinion. That exception has no application here for the reason that Chancellors are State officers under the constitution; and by the same authority the Governor has the right to fill vacancies pending election. See, also, *Matthews* v. *Bailey, Governor,* 198 Ark. 830, 131 S. W. 2d 425.

The assertion that Mrs. Hale is a Chancellor *de jure* advances for consideration the argument that our Constitution invests the Governor with power to fill vacancies; for, say proponents, since the Act that undertook to cre-

ate the Chancery Division named an incumbent, no vacancy existed and the Executive has not been deprived of any right. The plausibility of this argument must yield to the practical mechanics of legislation which afforded the General Assembly every procedural convenience to establish the Division and at the same time produce a vacancy. Had that been done each governmental department—legislative and executive—would have acted in its accredited field, neither impinging upon the other.

The most difficult problem is whether, in spite of the severability provision of Sec. 12, the Division would have been created had the General Assembly realized the appointment was a nullity.

Argument that the creative sections—1, 2 and 3—would not have been enacted had it been known the vacancy could be filled only by executive appointment or election, finds support in the fact that the three sections lead logically into Section 4. It is our view that the Act was intended as a whole. It was a new departure. Legislators must have been cognizant of the unusual power they were attempting to exercise and unquestionably there was doubt regarding constitutionality of the method adopted; and yet, in spite of this, no alternative was expressed—only the provision for an election to be held more than twenty months in the future.

Amendment No. 29 to the Constitution directs the Governor to fill vacancies " . . . in the office of United States Senator, and in all elective state, district, circuit, county, and township offices except those of Lieutenant Governor, Members of the General Assembly, and Representative in Congress of the United States," and (Sec. 2) " . . . No person appointed under Section 1 shall be eligible to appointment or election to succeed himself."

Under this discriminating provision appointment to a vacancy in the *circuit* for the term running between creation of the Division and election would have rendered such appointee ineligible as a candidate in succession; hence we must conclude that with the Amendment as a guide, and with a desire to promote to the Chancellorship

the officer then serving as Master in Chancery, it was felt that the technical distinction between appointment to an office not previously existing, and appointment to fill an admitted vacancy, was a tenable assuasive, hence no vacancy as contemplated by Amendment No. 29 had been filled. This line of argument might easily lead one into infinite fields of inductive reasoning, but it could hardly eliminate from the Constitution the expressed intent that one invested with an office in any of the "circuits" whose right rests upon any security less than an election must stand aside as an ineligible when an election is legally held.

In considering arguments advanced by the respondent-appellee that the General Assembly did not intend to create an office and leave it vacant (for, they say—quoting from *Hutchenson* v. *Pitts,* 170 Ark. 248, 278 S. W. 639—" . . . it is an elementary principle that the law abhors vacancies in public office")—in this connection it is difficult to say that where so much attention was given to a proscribed method of appointment in an effort to prevent the office from being vacant until it could be filled by the Governor, February 7, 1947, the purpose was other than to adroitly blend the principal transaction with incidental provisions, and thus retard or obscure recognition of the harmful element.

The right of a State Legislature to make appointments in circumstances where under the constitution that power was placed elsewhere was discussed by the Supreme Court of Indiana in three pertinent cases, one of which dealt with the judiciary. In *State of Indiana ex rel. Alvin P. Hovey* v. *William T. Noble et al.,* 118 Ind. 350, 21 N. E. 244, 4 L. R. A. 101, 10 Am. St. Rep. 143, consideration was given to the General Assembly's asserted right to create and name Commissioners of the Supreme Court. They were charged with the duty of aiding and assisting the Court under such rules and regulations as might be promulgated by that body, "and to aid and assist the Court in the performance of its duties."

The Supreme Court first held that the duties with which it was charged were created by the constitution,

and that only judges whose offices were so created could collectively function as a court. In *State of Indiana ex rel. Henry Jameson et al.* v. *Caleb S. Denny et al.*, 118 Ind. 382, 21 N. E. 252, 4 L. R. A. 79, attention was called to Sec. 1, art. 3, of the Indiana Constitution, providing that "The powers of the government are divided into three separate departments: the legislative, the executive, including the administrative, and the judicial; and no person charged with official duties under one of these departments shall exercise any of the functions of another, except as in this Constitution expressly provided." Our Constitution (art. IV, Secs. 1 and 2) is: "The power of the government of the State of Arkansas shall be divided into three distinct departments, each of them to be confined to a separate body of magistry, to-wit: Those which are legislative to one, those which are executive to another, and those which are judicial to another. No person, or collection of persons, being one of these departments, shall exercise any power belonging to either of the others, except in the instances hereinafter expressly directed or permitted."

In the Jameson-Denny case the Indiana Court held that power vested in the legislature "to provide by law the manner or mode of making an appointment to office, does not include the power to make the appointment."

In the Hovey-Noble case it was said concerning the commissioners: "If the duties assumed to be assigned [to them] are judicial, then they must constitute a court, since only courts can exercise judicial power. But, as no such court is recognized by the Constitution, it can have no legal existence. If, however, it be conceded that the tribunal which the Act assumes to establish is a court, then the instant the Act took effect the offices of the judges of that court were vacant." And, in respect of judicial power: " . . . It is the Constitution, and not the Legislature, which makes the investiture, and it is the courts and judges who are invested with [this] power." See *City of Evansville et al.* v. *State of Indiana, ex rel. Fred Blend,* 118 Ind. 426, 21 N. E. 267, 4 L. R. A. 93.

So, in the case at bar, the Constitution invests judicial power in courts, and it places appointive power with

the Executive—certainly as to the enumerated offices. There is no color of right, no semblance of authority, no repository of power even inferentially hinted at in the Constitution, no fine shade of reason from which substance might spring, and no theory upon which those charged with promulgating the State's public policies and enacting its laws, can assign to themselves a duty expressly placed elsewhere by the very Constitution which created a legislative department.

Appellee-respondent argues that facts in *Keith* v. *State,* 49 Ark. 439, 5 S. W. 880, support the proposition that with creation of the Chancery Division in the instant case and the attempted appointment of a Chancellor, the person so designated became a *de facto* judge if not in fact *de jure.*

In the Keith case Judge R. H. Powell had been regularly elected to preside over the Third Judicial Circuit. The Fourteenth Circuit was subsequently created, involving a reassignment of counties. The legislative directive was that ''The Circuit Judge elected at the last general election for the Third Circuit, whose residence falls within the Fourteenth, as created by this Act, shall continue to exercise the functions of Circuit Judge for the Fourteenth Circuit until his successor is elected and qualified as now provided by law.''

By a plea to the Court's jurisdiction, and by subsequent plea in abatement when found guilty on a criminal charge, Keith undertook to question the Court's jurisdiction when his appeal was lodged in the Supreme Court. Chief Justice Cockrill held that appeal was not the right remedy. It was also held that the record disclosed that Powell, if not a judge *de jure,* was a judge *de facto,* hence the conviction could not be attacked collaterally.

The difference between Keith's position and the situation here presented is that Powell, having been elected to the judgeship, was assigned to a different district, but nevertheless he had been elected. His judicial status was created by machinery set in motion by the Constitution. He was a regular judge who had been duly commissioned and had taken the oath of office; hence his acts in a par-

ticular case were subject to review at the instance of the State only.

In the absence of election to office (however defectively the election may have been held) one may claim to be a *de facto* officer by virtue of appointment only in the event the appointing power had authority or apparent authority to make the designation. If the agency lacked the actual or ostensible authority to appoint in any circumstance, its appointee cannot be considered a *de facto* officer. This is true because the attempt would not be the improper exercise of an existing power, but an effort to exercise a non-existent power.

Conditions under which a judgment is absolutely void were discussed by Chief Justice BUNN in *Caldwell v. Barrett,* 71 Ark. 310, 74 S. W. 748. The following language is found in the opinion:

"In order to be a *de facto* judge there must be a regularly constituted office and a vacancy therein before one appointed or elected to fill such office can be denominated a *de facto* officer. . . . When there is an office, and no *de jure* officer to exercise its functions, then one appointed under the form of law would be a *de facto* officer at least, and his acts are not to be called in question collaterally. The question is quite different where there is no *de jure* office, . . . for the foundation of the proceeding must be . . . a lawfully created court, or there is a total want of jurisdiction in the court itself to hear and determine the case, and this jurisdictional infirmity will annul any proceedings therein on mere suggestion to the proper court. It would be beyond all precedent to term the judge presiding in a court which is not a court at all a *de facto* judge."

And, for the same reason, one appointed to an office that does exist, *but not appointed under form of law,* would not be a *de facto* officer.

Result of our holding is (a) that in spite of words of severability used in Act 42, the General Assembly did not intend that the office it attempted to create should be filled by executive appointment, hence there was no dis-

tinct or independent purpose to divide the circuit or district and leave the office vacant for almost two years, and (b) not having the power of appointment, the Legislature could not lend color to acts of the person named; hence, judgments, orders, and decrees are without legal force. It follows that the decree must be vacated, but inasmuch as the cause was filed in Pulaski Chancery Court, which is unaffected by the legislation, it is remanded for consideration.

Cause No. 8371 (*Helen D. Stevens* v. *Arthur G. Stevens*) is another appeal from the Second Division, submitted December 8, 1947. The decree there, also, must be set aside and the cause remanded to Pulaski Chancery Court.