In The Matter Of: Dianna Lynn
GIURBINO and Sandra Kay
GIURBINO, Minors
Betty Giurbino FORTIN *v.* Mr. and Mrs. George
PARRISH and Mr. and Mrs. Mike REEVES

75-17 524 S.W. 2d 236

Opinion delivered June 16, 1975

*R. H. Mills,* for appellant.

*Walter R. Niblock,* for appellees.

CARLETON HARRIS, Chief Justice. This is an appeal by Betty Fortin from a judgment entered by the Washington County Circuit Court.[1] Mrs. Fortin is the mother of Dianna Lynn Giurbino and Sandra Kay Giurbino, minors[2] who were originally taken from her custody on August 21, 1969, and a temporary order was entered placing custody with Children's Services of the State Department of Welfare. On September 18 the juvenile court found these children (and another not involved in the present litigation) to be dependent and

[1]Attention here should be directed to Rule 9 (b) "Statement of the Case" which provides that an appellant's abstract and brief shall begin with a concise statement of the case, ordinarily not to exceed two pages in length. The present statement of the case comprises 17 printed pages and necessarily involves a great many matters that have no proper place in the Statement of the Case.

[2]Petitioner was divorced from her husband, Phillip Giurbino, before any of these proceedings commenced, and married Jim Fortin in March, 1969.

neglected and Children's Services was ordered to place Dianna Lynn with Mr. and Mrs. Mike Reeves of Springdale, and Sandra Kay with Mr. and Mrs. George Parrish of Springdale, the children to remain with these custodians (commonly called foster parents) until further orders. This order was signed by Vol B. Lester, County Judge of Washington County and Bob I. Mayes, Referee, Juvenile Court. On April 22, 1971, the two children were placed in the full and legal custody of Mr. and Mrs. Reeves and Mr. and Mrs. Parrish, respectively, the order being signed by Bob I. Mayes, Judge, Washington County Juvenile Court. On January 10, 1972, subsequent to a filing of a motion by Mrs. Fortin to set aside the April 22, 1971 orders, Mayes found that the April 22, 1971 orders were entered without proper notice having been served upon Mrs. Fortin; that this constituted a denial of her legal rights or due process and an order was entered on January 27, 1972, setting aside the April 22 orders and reinstating the September 18, 1969 order.

On February 9, 1972, Mrs. Fortin filed a petition, asserting that the original order (of September 18, 1969) was interlocutory in nature, alleged changed circumstances, and sought permanent custody of the children. On April 20, 1972, Mayes granted the petition and restored custody to Mrs. Fortin, but this order was summarily set aside because the attorney for appellees and appellees had not received notice.

On July 25, 1972, the custody of the little girls was again placed respectively with Mr. and Mrs. Reeves and Mr. and Mrs. Parrish. This order was signed by Vol B. Lester, Washington County Judge and Bob I. Mayes, Referee, Washington County Juvenile Court. From this order, appellant appealed to the Washington County Circuit Court. In that court, Mrs. Fortin filed a motion to quash, set aside, and hold for naught all orders entered by the referee, asserting that the appointment of the referee was contrary to the Constitution of Arkansas, and that any order entered by him was without force and effect and unconstitutional; that Ark. Stat. Ann. §§ 45-202.1 and 45-202.2 (Supp. 1973) were unconstitutional and that delegation of judicial duties of the county judge to a referee is contrary to Article 7, Sections 28 and 29 of the Arkansas Constitution. This motion was sub-

sequently denied, the court holding that it was untimely filed on all orders previously issued by the Washington County Juvenile Court except as to the July 25, 1972 order; further, that that order recited proper jurisdictional facts on its face and there were no facts before the court indicating improper jurisdiction. Thereafter, on May 24, 1974, the court conducted a *de novo* trial on the question of whether the juvenile court order of July 25, 1972 should be set aside, the court hearing numerous witnesses. Following the conclusion of the trial, the following pertinent findings were made:

"1. That the Court has jurisdiction of the parties and subject matter.

2. That the Order of the Juvenile Court of Washington County, dated July 25, 1972, is valid and proper.

3. That Betty Giurbino Fortin is the natural mother of Sandra Kay Giurbino and Dianna Lynn Giurbino.

4. That in addition to the consideration of neglect and/or delinquency, the best interest and welfare of the children should also be considered in awarding their custody. (Boatwright vs. Pulaski County Juvenile Court, 250 Ark. 138.)

5. That Act 404 of 1969 authorizing County Court to appoint a Referee to hear juvenile cases involving neglected and/or delinquent is constitutional.

6. That Act 215 of 1911, as amended by Act 420 of 1917 of the Statutes of Arkansas conferring jurisdiction on the County Court of juveniles is constitutional (Ex Parte King, 141 Ark. 213).

7. That the Order of the Washington County Court dated August 1, 1969, appointing Bob I. Mayes as Referee for the Juvenile Court of Washington County, Arkansas, under provisions of Act 404 of the Acts of Arkansas for 1969 is valid and proper."

Thereupon, the court vested custody of Sandra Kay Giurbino in appellees Parrish and the custody of Dianna Lynn in appellees Reeves until further orders of the Juvenile Court of Washington County. From the judgment so entered, appellant brings this appeal. For reversal, several points are asserted, which we proceed to discuss, some being related and discussed together.

It is first contended that all orders entered by the referee are unconstitutional and without force and effect for the reason that Ark. Stat. Ann. (Supp. 1973) §§ 45-202.1 and 45-202.2 are an unconstitutional delegation of judicial power, violating Article 7, §§ 28 and 29 of the Arkansas Constitution. This point, of course, raises a constitutional question, but we have said many times that this court will not decide constitutional questions unless such a decision is necessary to a determination of the pending case. See *McLeod, Commissioner of Revenues v. J. E. Dilworth Co. and Reichman-Crosby Co.*, 205 Ark. 780, 171 S.W. 2d 62, and *Holt v. Howard*, 206 Ark. 337, 175 S.W. 2d 384, and cases cited therein. Since we are of the view that the constitutional question is not vital to a determination of this litigation, we refrain from making such a determination, as same would be *dicta*. However, it is necessary that we preliminarily, to a degree, discuss the contention in order to make evident this fact. Appellant first calls attention to Article 7, Section 28 of the Arkansas Constitution of 1874[3] and emphasizes the last sentence reading, "The county court shall be held by one judge, except in cases otherwise herein provided," and the case of *Nixon v. Allen*, 150 Ark. 244, 234 S.W. 45, is cited in support of that assertion. We agree that the constitutional section so provides, and that the case so holds. Appellant's purpose in citing this provision is that it is contended that Ark. Stat. Ann. § 45-202.1 and § 45-202.2 (Supp. 1973) create a new court to pass on juvenile cases. With this assertion, as hereinafter discussed, we do not agree.

---

[3]"The county courts shall have exclusive original jurisdiction in all matters relating to county taxes, roads, bridges, ferries, paupers, bastardy, vagrants, the apprenticeship of minors, the disbursement of money for county purposes, and in every other case that may be necessary to the internal improvement and local concerns of the respective counties. The county court shall be held by one judge, except in cases otherwise herein provided."

Let it first be said that the General Assembly of 1911 passed Act 215, *inter alia,* creating juvenile courts, defining dependent, neglected and delinquent children, and vesting jurisdiction in the county courts (§§ 45-201 — 45-206).[4] An attack was made upon this act as being unconstitutional, the argument being that the legislature had created a new court which it had no authority to do under Article 7, Section 1, Arkansas Constitution. In *Ex Parte King,* 141 Ark. 213, 217 S.W. 465, the act was upheld, this court stating:

"The key note for the construction of this act to determine whether or not it was the purpose of the Legislature to create an independent tribunal with separate powers is found in the second and third sections. The second section confers upon the 'county courts original jurisdiction in all cases coming within the terms of this act.' The third section, while designating the court as the 'Juvenile Court' and its record as the 'Juvenile Record,' expressly declares that this is done 'for convenience.'

"Construing the act as a whole, we have reached the conclusion that it was not the purpose of the Legislature to create an independent tribunal and to confer upon it judicial powers. The act, therefore, does not offend against article 7, section 1, of our Constitution, which provides that, 'The judicial power of the State shall be vested in one Supreme Court; in the circuit courts; in county and probate courts, and in justices of the peace.'

"In 7 R.C.L., p. 981, sec. 9, it is said: 'In most of the jurisdictions in which juvenile court legislation has been enacted, separate and distinct courts have not, however been provided for, but the jurisdiction of the regular courts has been enlarged to cover the matters embraced in the legislation.' The judicial power conferred by this act, as we construe it, is vested in the county courts."

---

[4]§§.45-203 and 204 were amended by the General Assembly in 1965, and § 45-201 was amended in 1973, but these amendments made no changes that are pertinent to this litigation.

The sections here under attack, enacted by the General Assembly as Act 404 of 1969, read as follows:

"45-202.1. Power to appoint referee. — The Judge of the Juvenile Court in each county is hereby given power to appoint a referee who shall have power to hear and pass on all Juvenile cases of girls, and of boys, up to the age of eighteen (18).

"45-202.2. Appeals from referee's decisions. —Appeals may be taken to the Judge of the Juvenile Court from the decisions of the referee as a matter of right by causing the papers to be lodged with the Judge of the Juvenile Court and within ten (10) days after the decision is made, upon demand, the clerk in charge of the Juvenile Court matters shall at once transmit the same to the Judge of the Juvenile Court."

The attack upon these sections is twofold, *viz.*, that the county judge is permitted to delegate his judicial function in violation of Article 7, Section 28 (heretofore quoted), and Section 29[5] of our State Constitution. It is also argued that the statutes mentioned amount to, in effect, the creation of a new court. From appellant's brief:

"The Legislature may create a new Court not mentioned or established by the Arkansas Constitution; however, the Legislature may not alter, change, limit, or divide a constitutionally established Court unless the authority to do so is clearly established in the Constitution."

We do not agree with appellant's argument. As pointed out in *Ex Parte King, supra*, no other court was created. The county Court (for convenience, called juvenile court) was simply given the authority to determine cases involving dependent, neglected and delinquent children. Here, in the case before us, likewise, no new court was created; rather, the

---

[5]"§ 29. The judge of the county court shall be elected by the qualified electors of the county for the term of two years. He shall be at least twenty-five years of age, a citizen of the United States, a man of upright character, of good business education and a resident of the State for two years before his election, and a resident of the county at the time of his election and during his continuance in office."

judge of the juvenile court (county judge) was only given power to appoint a referee to pass on all juvenile cases. The emergency clause of Act 404 of 1969 sets out the purpose in enacting the legislation as follows:

"It is hereby found and determined by the General Assembly of the State of Arkansas that because of the increasing number of youthful offenders that a referee would be an invaluable aid to the speedy administration of justice in the various counties of this State; and that this Act is immediately necessary to permit the appointment of a juvenile court referee in each county in the State."

Now, there would seem to be but little doubt that the appointment of a referee for the purpose of aiding the juvenile judge by making recommendations for a disposition of particular cases, much in the same manner as a master in chancery, would be entirely valid; in fact, there is no attack on such a function. But appellant says that the powers given in the sections under discussion to the referee are the powers of a court and that Mayes acted in that capacity, in violation of the constitutional sections heretofore mentioned.

Even if we should agree with this contention, nonetheless, we are definitely of the opinion that Mayes was a *de facto* judge and this premise is based upon the cases of *Howell* v. *Howell* and *Stevens* v. *Stevens*, 213 Ark. 298, 208 S.W. 2d 22, and *Pope* v. *Pope*, 213 Ark. 321, 210 S.W. 2d 319. In 1947, the General Assembly passed Act 42 which divided the chancery court of the first chancery circuit into two divisions, to be known as the first division and second division of the first chancery circuit. The act further provided that the chancellor then in office would be the chancellor of the first division and that the chancellor of the second division would be the "present master in chancery of the chancery court of Pulaski County, who shall hold said office until January 1, 1949. At the general election in November, 1948, there shall be elected a chancellor for said second division of the chancery court, who shall take office January 1, 1949. ***." The master in chancery was Mrs. Ruth Hale. Thereafter, Judge Hale granted various divorce decrees and her authority was at-

tacked in the cases just cited. The contention was that, though the General Assembly had the authority to create the second division, it had no authority to name the chancellor of that division, this being a function of the Executive Department (Governor). By a four to two (one justice being away) vote in *Howell* v. *Howell* and *Stevens* v. *Stevens, supra,* we held that the act was unconstitutional since only the Governor had the constitutional authority to make this appointment, and further held that Mrs. Hale was not a *de facto* officer, stating:

> "In the absence of election to office (however defectively the election may have been held) one may claim to be a *de facto* officer by virtue of appointment only in the event the appointing power had authority or apparent authority to make the designation. If the agency lacked the actual or ostensible authority to appoint in any circumstance, its appointee cannot be considered a *de facto* officer. This is true because the attempt would not be the proper exercise of an existing power, but an effort to exercise a non-existent power."

It was then pointed out that where there is no *de jure* office, there can be no *de facto* judge. From the opinion:

> " 'The question is quite different where there is no *de jure* office, . . . for the foundation of the proceeding must be . . . a lawfully created court, or there is a total want of jurisdiction in the court itself to hear and determine the case, and this jurisdictional infirmity will annul any proceedings therein on mere suggestion to the proper court. It would be beyond all precedent to term the judge presiding in a court which is not a court at all a *de facto* judge.'

> "And, for the same reason, one appointed to an office that does exist, *but not appointed under form of law,* would not be a *de facto* officer."

In strongly worded dissents, two members of the court disagreed, stating that, in their view, Mrs. Hale was a *de facto* judge, and that her acts could not be questioned in the cases presented. It was pointed out, that in the view of the dis-

senters, a valid, legal, *de jure* court had been created, and that Mrs. Hale was a *de facto* judge. Justice Ed McFaddin,[6] citing 46 C.J. 1057, stated:

"One who holds an office under an appointment or election giving color of title may be a *de facto* officer, although the appointment or election is irregular, or invalid, or although he has been appointed by an authority not competent under the law to make the appointment, and even though his title is derived from an unconstitutional statute."

Still further,

"The principle is that the acts of an officer *de facto* are binding upon the public as though done by one in office *de jure*, and that his right to the office cannot be questioned except in a direct proceeding to which he is a party, is well settled and is not new in this court. *Moore, as Adm'r.* v. *Turner,* 43 Ark. 243; *Pearce* v. *Edington,* 38 Ark. 150; *Kaufman* v. *Stone,* 25 Ark. 336; *Caldwell* v. *Bell & Graham,* 3 Ark. 419; S.C., 6 id., 227; *Hildreth's Heirs* v. *McIntire's Devisees,* 1 J. J. Marsh, 206, 19 Am. Dec., 61, and note."

Justice McHaney,[7] in his dissent, stated, in quoting Vol. 43 Am. Jur. p. 224, § 470, the following:

"The *de facto* doctrine was ingrafted upon the law as a matter of policy and necessity, to protect the interests of the public and individuals involved in the official acts of persons exercising the duty of an officer without actually being one in strict point of law. It was seen that it would be unreasonable to require the public to inquire on all occasions into the title of an officer, or compel him to show title, especially since the public has neither the time nor opportunity to investigate the title of the incumbent. The doctrine rests on the principle of protection to the interests of the public and third parties, not to protect or vindicate the acts or rights of the particular

[6]Justice Millwee joined in this dissent.

[7]This Justice had originally been absent, but participated on rehearing.

*de facto* officer or the claims or rights of rival claimants to the particular office. The law validates acts of *de facto* officers as to the public and third persons on the ground that, although not officers *de jure*, they are, in virtue of the particular circumstances, officers in fact whose acts public policy requires should be considered valid.

"Judicial as well as ministerial officers may be officers *de facto*, within the rule, hereafter considered, that the acts of a *de facto* officer are valid as to the public and third persons."

Without going further into either the majority opinion or the dissents, some three months later, in *Pope* v. *Pope,* 213 Ark. 321, 210 S.W. 2d 319, Justice Frank Smith, whose vote had helped make the opinions in the cases of *Howell* v. *Howell,* and *Stevens* v. *Stevens, supra,* stated that he had receded from that view, and that he was of the opinion that the dissenters were correct; that there was a *de jure* office and that Judge Hale was a chancellor *de facto.* Accordingly, the law is as stated in the dissents in the cases cited.

In the case before us, the office of juvenile judge (so called for convenience) is certainly a *de jure* office, validity of such being upheld in *Ex Parte King, supra.* Mr. Mayes received the appointment under a legislative act from an authority authorized to make the appointment which certainly had the effect of "color of title", and under the authority cited by Justice McFaddin, was a *de facto* officer even though his "title" (if it should be so found) was derived from an unconstitutional statute.

Actually, whatever the status of Mayes, Mrs. Fortin certainly was not, in any event, deprived of any right, for she received a completely *de novo* hearing by the circuit court, which heard numerous witnesses, and rendered its judgment on the basis of the evidence heard by the judge thereof. For that matter, the only reason that the case was not fully heard by the county judge himself was because appellant by-passed a hearing in that court in order to reach the circuit court at an earlier date.

It is urged that the mother and two minor children have been denied due process of law as required by the United States Constitution and Arkanaas Constitution, in that each has the fundamental right to the society of each other, and the State cannot interfere with such right unless it is proven by clear and convincing evidence that the parent is unfit. In connection with this point, it is also asserted that the question of the best interest of the child cannot be raised until the unfitness of the natural mother is established; also, it is pointed out that the circuit court made no finding that the children were either dependent, neglected, or delinquent at the time of the *de novo* trial in circuit court. As to this last, such a finding could hardly have been made, for the children had been living for approximately five years with the foster parents and, according to the evidence, were being well taken care of. The original order of the juvenile court found that these children were dependent and neglected; this order was not appealed. The July 25, 1972 order (here on appeal) sets out that Mrs. Fortin does not seek to have the judgment of September 18, 1969 set aside on the ground "that the said minor children were not dependent or neglected children at the date of that judgment, but rather on the ground that the situation of petitioner has so changed since that date of judgment as to merit or justify the returning of the children to her custody ***." The present situation of appellant is, of course, intertwined with the question of the best interests of the children, and in *Boatwright* v. *Pulaski County Juvenile Court,* 250 Ark. 138, 464 S.W. 2d 600, we pointed out that a principal concern is "the best interest and welfare of the child." In that case, a minor child was adjudged by the Pulaski County Juvenile Court to be a dependent and neglected child, and custody was removed from the mother and the boy placed in the custody of Jim Fisher, Operator of Shawnee Valley Boys Ranch near Harrison. Three years later, after the mother had regained her health and had obtained a steady job, she petitioned that the boy be returned to her custody. The petition was denied, and the circuit court affirmed. On appeal, we affirmed, stating, "Of course it is a universal rule of law that the paramount consideration in awarding custody of minor children is the best interest and welfare of the child. *With that rule of law as a guide we examine the evidence.*" [Our emphasis].

In *Boatwright, supra,* we mentioned that the mother was not as unstable as in 1966 when she relinquished custody of her son. Here, too, it may be stated that Mrs. Fortin is in much better condition, both financially and healthwise, than in 1969. According to Mrs. Fortin, she was sick in 1969, and had a nervous breakdown, but she stated that she presently is in good health; that she was without funds and unable to care for the children in 1969, but such condition no longer exists. Harlan Mounce, a brother of appellant, said that Fortin had been one of his employees and the two formed a partnership in masonry work; he testified that from March 26, 1973 to the same date in 1974, the two netted about $6,000 each from their work. According to Mrs. Fortin, appellant and her husband are purchasing a two-story frame house in Springdale, with eight rooms and two and one-half baths.

Mrs. Fortin testified that she had married Mr. Fortin in March of 1969 and that after the court entered its order taking the custody of the children from her, she and her husband went to South Dakota, where Mr. Fortin took a job on a ranch. They returned to Arkansas in January of 1970. After the juvenile court had entered the order of July 25, 1972 (here on appeal), an order for visitation rights for appellant was obtained, and on the occasion of one of these visits, she, without permission of court or appellees, took the children to South Dakota to the home of her mother-in-law. This occurred in August, 1972, and the children were enrolled in school there, but remained only a short time. Mr. and Mrs. Reeves and Mrs. Parrish went to South Dakota, presented the court order and the children were released to them and returned to Arkansas. Testimony was offered on behalf of appellant by relatives of her husband in South Dakota as to her care of the girls and their apparent affection for her. Also, Don Reed of Brentford, South Dakota, the school bus driver during the period from August 27 to September 7 when the little girls were attending school there, testified that they were well-dressed, an opinion concurred in by Quentin C. Miles, Superintendent of Schools for the District, who added that they were also well-mannered. Erma Parmeter and Ruby Holenbeck, residents of Ashton, South Dakota, testified by deposition that the girls were always well-dressed and well-mannered and were not neglected by their Mother. Eileen

Francoli of Ashton, according to her deposition, a "homemaker and bar owner" stated that the children were clean, "hair was always combed", and she had "never seen a Fortin child who was dirty." Charlotte Sutton, a witness on behalf of appellant, who had formerly lived in apartments owned by Parrish, testified that this appellee and his wife fussed and argued quite a bit.

Mr. and Mrs. Reeves and Mr. and Mrs. Parrish testified as to the care given the children, and several residents of Springdale also testified as to the church activities of the appellees and the fact that the little girls were neatly dressed and well-behaved. Mr. Reeves testified that on several occasions, Mr. Fortin had followed him and his wife, making threats and telling them if they didn't leave the children alone, something was going to happen to Mr. Reeves. He mentioned a particular occasion when Fortin told him to get out of his car, evidently challenging him to fight, stating that the latter was extremely dirty and had been drinking. At this point, the record reflects that Fortin, sitting in the courtroom, called out, "You are a liar." According to Reeves, they were followed on about four different occasions, and he mentioned that once, Fortin passed him three or four times and stopped on the highway so that Reeves had to pull around to get by.

As far as personal conduct is concerned, Mrs. Fortin stated that her drinking ceased in 1972 and that she had not been arrested for drinking or related offenses since October, 1971. She was unable to say how many times she had been arrested or convicted in the Springdale Municipal Court prior to that time. Of course, it is noticeable that Mr. and Mrs. Fortin had been married for approximately six months before the children were ever taken from her, and according to Mrs. Fortin, her husband had a job waiting for him in South Dakota at that time. Testimony that bears significance is that of Sandra Kay, 12 years of age, and the oldest of the two girls. Sandra Kay testified that she was in the fifth grade, making good grades. She said that she first went to live with the Parrishes when she was six years old and had been with them most of the time since; that she wanted to live with them and did not desire to move. The little girl said that she attended church every Sunday morning, Sunday evening, as

well as on Wednesday night. She testified relative to being taken to South Dakota by her Mother and said that she knew her Mother drank "By the smell on her breath." With reference to when it was time to go to bed, Sandra said:

> "They would lock us up, with this little thing over the door. They put the rug cleaning thing over the door; it's made like a piano and has strings on it, and they put it over the door."

According to the witness, she and her sister were unable to remove this object and she said that they were kept in their room by this method when Mr. and Mrs. Fortin "wanted to talk or drink." Sandra stated that she was happy when appellees came to South Dakota to get them, and that she had no desire to tell her Mother "good-bye" on that occasion;[8] that she had no present desire to visit with her Mother or Stepfather, and in fact, did not want to see her Mother any more.

Child custody cases are always difficult, and particularly so where the choice is between a parent and persons who have had custody of a child for a long number of years and ties of love and affection have been established. We are not unmindful of the rights of a natural parent, and it does appear that this mother has earnestly endeavored to have the children returned to her custody. It, of course, likewise appears that Mrs. Fortin, in earlier years, was somewhat unstable, and whether she has demonstrated a change in her habits for a sufficient period of time was a matter for the trial court to determine. The acts of Mr. Fortin, heretofore enumerated, of course, were not conducive to a favorable finding in behalf of appellant, and, as pointed out, the evidence of Sandra Kay was important. All in all, we are unable to say that there was no substantial evidence to support the findings of the circuit judge; for that matter, under present circumstances, we could not say that his findings were even against the preponderance of the evidence.

Affirmed.

---

[8] The children were picked up by appellee at the school and taken directly to Arkansas.